COMMONWEALTH *vs.* JEFFREY WILLS.

Norfolk.   October 7, 1986. — December 10, 1986.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Homicide. Search and Seizure,* Warrant. *Evidence,* Admissions and con-
fessions, Relevancy and materiality, Fingerprints. *Constitutional Law,*
Search and seizure, Admissions and confessions. *Practice, Criminal,*
Instructions to jury, Presumptions and burden of proof.

Police officers executing a warrant to search a defendant's residence for
items including any "material used to treat, clean, or conceal a knife
wound" and "any knives or sheaths" did not exceed either the authorized
scope or intensity of the search when they opened and "fanned through"
two photograph albums stacked in open view in the defendant's bedroom,
inasmuch as the albums were a possible place of concealment of the
items described, and the officers thereafter could properly obtain an
additional warrant for seizure of the albums on the basis of their obser-
vations in the bedroom and their discovery of discarded photographs
scattered in an open field behind the defendant's home. [774-775]
The evidence amply supported a judge's determination, after extensive voir
dire, that a criminal defendant's statements made to police officers while
he was receiving treatment in a hospital for knife wounds were voluntary
beyond a reasonable doubt and the police, having given the defendant
his Miranda warnings, were not required, as matter of law, to advise
him of either his status as a suspect or the nature of the crime about
which he was to be questioned. [775-777]
At a murder trial, the judge acted within his discretion in admitting in evi-
dence certain blood-stained items, namely, a hunting knife, gloves, and
cut-off jeans, all of which were in a paper bag, which itself appeared
to have been freshly discarded when found by police several yards from
the defendant's house about ten hours after the victim's body had been
discovered, even though there was no direct evidence that the items
belonged to the defendant. [777-778]
At his trial for a murder and burglary committed in September, 1982, a de-
fendant was not entitled to have the jury cautioned that a certain finger-
print discovered on the outside screen of a bedroom window in the
victim's house, if found to be that of the defendant, could be considered
as showing only that he had been present at the house at some time,
but not necessarily at the time the crimes were committed, where there

was no evidence that any "Peeping Tom" activities of the defendant, on which he based his request, had occurred after June, 1981, and where other testimony tended to prove that the screens had been replaced early in 1982 and that the incidents had not occurred at the window where the fingerprint was found. [778-779]

Where the judge at a criminal trial adequately instructed the jury concerning circumstantial evidence, the defendant was not entitled to the particular form of instruction he had requested. [779-780]

The judge at a criminal trial adequately instructed the jury concerning the presumption of innocence. [780-781]


INDICTMENTS found and returned in the Superior Court Department on September 27, 1982.

The cases were tried before *William G. Young,* J.

*Willie J. Davis* for the defendant.

*Stephanie Martin Glennon,* Assistant District Attorney (*Charles J. Hely,* Assistant District Attorney, with her) for the Commonwealth.

LIACOS, J. The defendant, Jeffrey Wills, was convicted by a jury of murder in the first degree and of armed burglary in connection with the fatal stabbing of Constance Jacobsen on September 11, 1982. He was sentenced to the Massachusetts Correctional Institution at Walpole (now Cedar Junction) for the term of his natural life on the murder conviction, and for a concurrent term of sixty to seventy years on the conviction of armed burglary. The defendant appeals to this court and seeks a new trial pursuant to G. L. c. 278, § 33E (1984 ed.).

The defendant claims that certain evidence should have been suppressed because it was discovered by police officers when their search exceeded the scope of an initial search warrant. He also claims that the trial judge erred in ruling that his statements were voluntary beyond a reasonable doubt; in admitting circumstantial evidence; and in his instructions to the jury. We conclude there is no error warranting reversal, or any circumstance warranting an exercise of our powers under G. L. c. 278, § 33E, and we affirm.

There was evidence of the following facts. Constance Jacobsen was found dead in her Needham home approximately 12:45 A.M., September 12, 1982. She had been stabbed seventy-seven

times. The homicide occurred some time after 8 P.M., the time when her fourteen-year old daughter, Christina, had left to babysit for neighbors. Returning home about midnight, Christina discovered that she had forgotten her house key. She knocked on the door. When her mother did not answer, Christina looked through the mail slot and saw blood on the wall in the hallway. She looked through her mother's bedroom window and saw her mother's body lying on the floor. She returned to the neighbor's home where she had been babysitting, and the neighbors called the police. Needham police officers came and found Constance Jacobsen lying in a pool of blood on her bedroom floor. She had multiple stab wounds on her body. The room and bedclothes were in disarray. There was blood smeared on the bedroom and hallway walls. The cord to the bedroom telephone had been cut. There were drops of blood on the floor between the victim's bedroom and her daughter's left rear bedroom. The window screen in the daughter's room was jammed up about four inches from the sill, and there was blood on the screen and the sill. There were spots of blood on the floor between Christina's room and the den, and on the handle to a door leading from the den to the back of the house.

Approximately thirty minutes before Constance Jacobsen's body was discovered, the defendant was admitted to the emergency room at Glover Memorial Hospital in Needham. He had a stab wound in his chest and another small wound on his left arm. He told the hospital staff that he had been walking near Forest Street[1] when someone jumped out from behind a tree and stabbed him.

Notified that a stabbing victim had arrived at the emergency room, the Needham police dispatched Officer Richard Rolanti to the hospital to investigate. Officer Rolanti advised the defendant of his Miranda rights before initiating any conversation.[2]

---

[1] Constance Jacobsen and her daughter lived on Forest Street in Needham. The defendant lived with his parents and sister approximately one-half mile from the Jacobsen residence.

[2] The defendant, however, was not in custody at that time.

The defendant responded, "Yes, I know." He then repeated, with some elaboration, the story he had told the hospital staff.[3] Needham Detective-Sergeant Robert J. Roman came into the emergency room and spoke to the defendant. He observed clothing on a chair and asked the defendant if these were the clothes he had been wearing when he was stabbed. The defendant said, "Yes." Detective-Sergeant Roman testified that there was no hole in the shirt consistent with the defendant's stab wound, although there was a tear on the sleeve consistent with the cut on his right arm.

While being treated for his injuries, the defendant asked that a bandanna around his neck not be removed because it was a "good luck piece." When the bandanna was removed, severe scratch marks, identified as being caused by a woman's fingernails, were found on the defendant's neck. The defendant explained that his girl friend had made them the previous night, but he would not provide her last name. The attending physician and nurse testified that the scratches appeared to be fresh, but they could not estimate with precision how recently they might have been inflicted.

Approximately 9:30 the same morning, Detective-Sergeant Roman and State police Corporal Robert G. Zepf spoke with the defendant for one-half hour at the hospital. Although the defendant still had not been taken in custody, the officer advised him again of his Miranda rights. Asked if he understood, the defendant indicated that he did and stated that he would talk. After the defendant repeated his prior story, Corporal Zepf asked if the defendant knew that there had been another stabbing in the neighborhood. He asked if the defendant "knew Connie Lynn Jacobsen" or if he had "ever been in her house." The defendant answered that he did not know Connie Jacobsen and did not think that he had ever been in her house. Asked if he had ever been invited into a house on Forest Street, he replied, "Not really." Corporal Zepf then stated that he wanted to give the defendant "the opportunity to be a hundred percent honest

---

[3] The defendant spoke with police officers twice more during the early hours of September 12, 1982. On both occasions he repeated the story that a man ran up, stabbed him, and then ran off.

about the whole thing." The defendant responded, "I don't do anything wrong no more." When the corporal said, "You know what I'm getting at," the defendant replied, "Yeah. You think I did it, then." When asked if he owned a knife, the defendant responded that he had had a big, black buck knife stolen the previous week.

Mark Rowell, a friend of the defendant, testified at trial that he and the defendant had broken into the Jacobsen home in 1978 and had taken several items, including photograph albums. On six or seven subsequent occasions, Rowell and the defendant went to the victim's house at night and looked at her through her bedroom window. During that period, the defendant told Rowell that he would like to engage in sexual acts with the victim. According to Rowell, the defendant told him on ten occasions that he fantasized about engaging in various sexual acts with the victim. The last of these "Peeping Tom" incidents occurred approximately in June, 1981.

Police officers investigating Constance Jacobsen's death executed three search warrants the morning of September 12, 1982.[4] After completing their search of the defendant's home, Detective-Sergeant Roman and Corporal Zepf returned to the hospital shortly after noon and informed the defendant that he was under arrest for the murder of Constance Jacobsen.

1. *Admissibility of photograph album.* The defendant argues that the search of his home, which revealed photographs of the victim, exceeded the scope of the first warrant and was therefore invalid. The first warrant authorized a search for (a) blood-stained clothing; (b) any towel, dressing, or material used to treat, clean, or conceal a knife wound; and (c) any knives or sheaths. During the execution of this warrant on the morning of September 12, 1982, Detective Bruce Bolio of the Needham police department searched the defendant's room in

---

[4] The second warrant, as to which the defendant claims no error, authorized a search of the defendant's automobile where a buck knife enclosed in a sheath and an empty sheath were found.

We summarize the facts regarding execution of the two warrants as to which errors are claimed in our discussion of the admissibility of photograph albums discovered during execution of the first warrant.

his parents' home. Detective Bolio noticed magazines, books, and "[a] couple of photo albums" stacked in open view on bookcases. The albums were "closed tight." Detective Bolio opened and "fanned through" the albums but did not seize them. He testified that he did the same with all of the books and magazines. Although nothing about the outward appearance of these items led him to believe that a bulky object such as a knife would be found therein, he testified that he "believed [he] had the authority to look in the albums." At that point, the officers had "no idea" of the size of the murder weapon. We note that the officers were also authorized by the first warrant to search for dressings, rags, or anything used to clean, or stop bleeding from, a wound.

Later, while searching an empty field directly behind the defendant's home, Detective Bolio found six loose photographs, including pictures of the victim, scattered on top of tall grass approximately 200 feet from the defendant's home. The photographs had been torn or cut out of some other object. Twenty-five to thirty feet away, he found a paper shopping bag under a tree. The bag contained a bent hunting knife, a pair of gloves, and cut-off jeans. All were covered with blood.[5] The bag was completely dry, although the grass was very wet. The police officers showed the defendant's father the items found in the bag. The father said, "Well, Jeffrey has a knife like that, but the blade isn't bent." He had seen it in his son's room "a couple of days before."

After the bloodied items and the victim's photographs were discovered in the field adjacent to the defendant's home, a third warrant was secured to search the defendant's home for a "Photo album w/photographs & Photographs." Pursuant to this warrant, Detective Bolio seized the two photograph albums which he had opened during his search of the defendant's room pursuant to the first warrant. The albums were later identified

---

[5] A forensic serologist testified that the blood on the cut-off jeans could not have come from the victim, but could have come from the defendant. The blood on the gloves could not have come from the defendant but could have come from the victim. He was unable to obtain any results from the knife.

by the victim's daughter as items which had been taken during a burglary at the victim's home two or three years earlier.

The defendant filed a pretrial motion to suppress all physical evidence, including the photograph albums, seized from his residence. He alleged that the search and seizures were illegal because (a) there was no probable cause for the issuance of the first warrant; (b) the first warrant and affidavit were insufficient on their face; and (c) the third warrant for the albums and photographs was obtained following execution of the first, invalid warrant. Hence, he argued, the material obtained in that last search was inadmissible under the doctrine of "fruit of the poisonous tree."

After hearing the testimony of eight witnesses, the motion judge ruled that the first search warrant and affidavit were sufficient to meet the test of probable cause. On appeal, the defendant does not dispute the judge's determination that there was probable cause to issue the first warrant. Rather, he argues that, when the police officers entered his home pursuant to the first warrant, they "exceeded the scope and intensity of the warrant by searching areas where items sought could not reasonably be expected to be found. Therefore, evidence resulting therefrom should have been suppressed."

The motion judge found that "[a]ll of the articles seized at the residence were within the scope of the first warrant." He ruled that "nothing impermissible was done during the search of the [defendant's] second floor room under the first search warrant. Nothing was taken from the residence that was not within the scope of this warrant, and everything examined was in open view." That ruling is supported by the evidence. The photograph album, measuring 10″ by 12″ and approximately 1½″ thick,[6] could have concealed a small knife or material used to treat, clean, or conceal a wound. The permissible intensity of a search is determined by the description of the items to be seized. The size of the object or objects sought affects the appropriate scope of the search. *Commonwealth* v.

---

[6] The album of photographs was introduced in evidence, and we have examined it.

*Lett,* 393 Mass. 141, 147-148 (1984). *Commonwealth* v. *Cefalo,* 381 Mass. 319, 330-331 (1980). For example, police officers may look in an envelope if they are searching for drugs. *Commonwealth* v. *Hawkins,* 361 Mass. 384, 387 (1972). See *Commonwealth* v. *Gabbidon,* 17 Mass. App. Ct. 525, 533 (1984) (motion judge's finding that a photograph album "was a reasonable place to look for a saw blade" warranted by the evidence).

The motion judge ruled that the affidavit[7] supporting the third search warrant fully described what was seen in the defendant's bedroom in open view and also what was found in the adjacent field.[8] He also ruled that there was probable cause to support issuance of the third warrant pursuant to which the albums were seized. His findings and conclusions were warranted by the evidence, *Commonwealth* v. *Moynihan,* 376 Mass. 468, 473 (1978), and we shall not disturb them. There was no error.

2. *Admissibility of defendant's statements.* The defendant argues that the judge erred in admitting his statements[9] to police

---

[7] According to Corporal Zepf's affidavit in support of the third warrant, Detective Bolio had observed a collage of women's photographs while searching the defendant's bedroom pursuant to the first warrant. Some of the photographs were missing. He also saw, scattered on the floor, photographs with masking tape stuck on their backs. Several apparently were cut from larger photographs. Of the photographs discovered in the field, several were cut and stuck with masking tape, as were those in the bedroom. Several were found to be of the victim. The affidavit also recited that the victim's former husband informed one of the investigating officers that the victim's house had been broken into on prior occasions. Family photographs and albums were reported missing following one of these breaks on January 17, 1978.

[8] The defendant does not contest the lawfulness of the search of the open field and seizure of the objects there. His argument is that these objects were inadmissible on evidentiary grounds. See part 3, *infra.*

[9] While the defendant contests the admissibility of all statements made by him, his brief before this court focuses particularly on his second conversation at the hospital at 9:30 A.M. on September 12, 1982, with Corporal Zepf and Detective-Sergeant Roman.

The defendant's claim of error is based on the alleged involuntariness of his statements, see *Commonwealth* v. *Garcia,* 379 Mass. 422, 428 (1980), and not on a violation of his rights under *Miranda* v. *Arizona,* 384 U.S. 436 (1966).

officers the morning after Constance Jacobsen's murder. He claims that the record did not support the judge's ruling that the statements were voluntary beyond a reasonable doubt. We disagree.

At the conclusion of voir dire hearings, the judge found that the defendant's statements, made at the hospital, to police officers at 12:45 A.M. and at 9:30 A.M. on September 12, 1982, were voluntary beyond a reasonable doubt. When we review a judge's determination that an admission was voluntarily made, we "grant substantial deference to the judge's ultimate conclusions and we will not reject a judge's subsidiary findings if they are warranted by the evidence." *Commonwealth* v. *Benoit,* 389 Mass. 411, 419 (1983). *Commonwealth* v. *Williams,* 388 Mass. 846, 851 (1983).

In this case, the judge held an extensive voir dire to determine the voluntariness of the defendant's statements. There was testimony that the attending physician indicated to the police officer that it was "medically all right" to speak to the defendant. When Corporal Zepf advised the defendant of his Miranda rights and asked if he understood, the defendant indicated that he did. Corporal Zepf then informed the defendant that the officers were investigating a homicide. Sergeant Roman and Corporal Zepf had no problem understanding the defendant; the defendant appeared to have no difficulty communicating with the officers and did not ask to have questions repeated. The defendant did not ask the police officers to leave, or ask for a doctor. He did not say that he was in pain or indicate that he did not want to speak further.

Despite the defendant's wounds, his condition was described as stable, calm, and alert. There is no suggestion in the record that the defendant suffered from any deficiency or physical condition that would undermine a finding of voluntariness. Nor is there any suggestion that the defendant's will was overborne by the questioning officer or by anyone else. The judge's determination that the defendant's statements were voluntary is amply supported by the evidence. There was no error.

The defendant urges this court to hold that "in order for a statement to be voluntary, a person has to know why he is

being questioned." He argues that "he was led to believe that the interrogation concerned only the crime committed upon his person." [10] Neither the evidence nor the law supports this argument. As noted above, the defendant was given Miranda warnings twice prior to the 9:30 A.M. statement. During his first conversation with Corporal Zepf at 12:44 A.M., the corporal told the defendant that he was investigating a homicide, and the defendant responded, "It was probably the same man that stabbed me."

Even if the evidence supported the defendant's argument, the law does not. "The prevailing view of relevant authority is that *Miranda* v. *Arizona,* 384 U.S. 436 (1966), does not require police to inform a suspect of the nature of the crime about which he is to be interrogated." *Commonwealth* v. *Medeiros,* 395 Mass. 336, 345 (1985). Additionally, we decline to impose a requirement that, before a statement may be considered to be voluntary, a suspect must be advised of his status as such or that he is charged with a particular crime. See *Commonwealth* v. *Amazeen,* 375 Mass. 73, 78-79 (1978).

3. *Admissibility of physical evidence.* The defendant argues that the judge erred in admitting, over objection, a bent hunting knife, gloves, and cut-off jeans which police officers had found several yards from the defendant's home in an open field. The items were discovered approximately ten hours after Constance Jacobsen's body was found. The defendant contends that the items should not have been admitted as circumstantial evidence tending to establish his guilt because he was not identified as being in possession of the items, and the items were not identified as connected to the crime.

---

[10] The defendant particularly objects to having been questioned without first being informed that he was a suspect in a homicide, or that anyone else had been stabbed that evening. In his view, the discussion shifted without warning from questions which police officers naturally would have asked anyone who came to the hospital with stab wounds to an interrogation regarding Constance Jacobsen's murder. According to the defendant, knowledge of the charges, or reasons for suspicion, would affect the accused's decision whether to seek prior advice of counsel or whether to make a statement at all. He cites no authority in support of this proposition, however.

Conceding that there was no direct evidence that the items belonged to the defendant, the judge ruled that, in the totality of the circumstances, the items were sufficiently relevant to be admitted. He noted the evidence that the defendant had stolen a photograph album containing photographs of the victim in 1978 and had expressed a specific state of mind with respect to conduct toward the victim.[11] The defendant was away from his home at the time of Constance Jacobsen's murder. The items were discovered in close proximity to the defendant's home and were "fresh," in the sense that the paper bag in which they were found had not deteriorated and that the photographs were on top of the long grass rather than beaten down into it.

We have defined relevant evidence as that evidence which has a "rational tendency to prove an issue in the case." *Commonwealth* v. *LaCorte,* 373 Mass. 700, 702 (1977). We accord the judge substantial discretion in deciding whether evidence is relevant. *Commonwealth* v. *Tobin,* 392 Mass. 604, 613 (1984). There was no error or abuse of discretion in admitting the blood-stained knife, gloves, and cut-off jeans in evidence.

*4. Instructions to the jury.* The defendant argues that it was reversible error for the judge to (a) refuse to give the defendant's requested instruction regarding fingerprints; (b) give an instruction on circumstantial evidence that was "incomplete" compared to what the defendant had requested; and (c) fail to define "presumption of innocence" as requested.

*A. Fingerprint evidence.* The police discovered a fingerprint on the outside screen of Christina's rear bedroom window in the Jacobsen's home. A State police sergeant gave expert testimony that he had compared the fingerprint with the known fingerprints of the defendant, observed nine points of comparison and concluded that the fingerprint on the screen was that of the right middle finger of the defendant. The defendant objected to admission of this testimony and made a written

---

[11] As noted above, the defendant's friend, Mark Rowell, testified that the defendant had told him several times that he fantasized about sexually attacking the victim.

request for a cautionary instruction[12] which stated, in part: "If you find as a fact that the fingerprint was that of the defendant, then I emphasize to you now that the fingerprint evidence was admitted into evidence to show only that the defendant was present at the Jacobsen House at some time, but not necessarily at the time the alleged crimes were committed. *Commonwealth v. LaCorte,* 373 Mass. 700 n.1 (1977)." The judge declined to give the requested instruction.

This court stated in *Commonwealth* v. *LaCorte:* "Certainly fingerprints found in the apartment of the victim immediately after the homicide have some tendency to prove the identity of the killer." *Id.* at 702. In the *LaCorte* footnote which the defendant cites in support of his request, we noted: "Since the defendant may have been in [the victim's] apartment on other occasions, the defendant *might have been entitled to a limiting instruction . . .*" (emphasis added). *Id.* at 702 n.1. We also stated that "[b]ecause of other circumstantial evidence . . . the judge might well have ruled that the defendant was not entitled to such an instruction." *Id.*

In the present case, as in *LaCorte,* there was circumstantial evidence to support the judge's refusal to give the requested instruction. The defendant emphasizes the evidence of prior "Peeping Tom" episodes to argue that the instruction mentioned in the *LaCorte* footnote was warranted. There was no evidence, however, of "Peeping Tom" incidents occurring after June 1981. The victim's daughter testified that the bedroom window screens, including the screen on which the fingerprint was found, had been replaced early in 1982. Further, the testimony regarding the "Peeping Tom" incidents indicated that they had occurred at the victim's window, not at her daughter's window where the print was found. There was no error. The trial judge properly exercised his discretion in declining to give the requested instruction.

B. *Circumstantial evidence.* The defendant next contends that the judge's charge on circumstantial evidence was incom-

---

[12] The defendant made the same request in his proposed instructions to the jury, and again registered a specific objection when his request was denied.

plete and that his failure to charge as requested was reversible error. The judge charged the jury: "[A] conviction based on circumstantial evidence can be returned only if the circumstances are consistent with the theory that a defendant, a particular defendant, in this case, Mr. Wills, is guilty beyond a reasonable doubt of the crime or crimes charged against him and not consistent with any other reasonable theory of the facts, any other reasonable interpretation. For there to be a conviction based upon circumstantial evidence, that evidence must convince you beyond a reasonable doubt and must be such as to exclude all other reasonable interpretations."

The defendant points to no flaw in this instruction and suggests no way in which his requested instruction differs in substance from what the jury were told. The defendant was not entitled to any particular instruction as long as the charge as a whole was adequate. *Commonwealth* v. *Sherry,* 386 Mass. 682, 696 (1982). See *Commonwealth* v. *MacDougall,* 2 Mass. App. Ct. 896 (1974) (judge need not grant specific requested instructions as long as substance is covered). There was no error.

C. *Presumption of innocence.* The defendant's final argument regarding the judge's instructions to the jury is that his failure to define "presumption of innocence" was reversible error which entitles him to a new trial.

The defendant correctly states that "Massachusetts tradition holds that judges must, upon request, instruct the jury that the defendant is 'presumed to be innocent'." *Commonwealth* v. *Drayton,* 386 Mass. 39, 46 (1982), quoting *Commonwealth* v. *Madeiros,* 255 Mass. 304, 315-316 (1926). The judge in this case, however, correctly and repeatedly instructed the jury on the presumption of innocence. The judge explained that presumption of innocence "is an important rule of law which tells us who has to prove what, and it tells us that the Commonwealth has to prove it all. Mr. Wills doesn't have to explain anything. He doesn't have to testify. His attorney doesn't have to ask a single question, or make any argument to you. He doesn't have to disprove anything. He starts presumed to be innocent and the Commonwealth must prove each and every

essential element of the charges against him before he could be found guilty of either of those charges; and the Commonwealth must prove those charges beyond a reasonable doubt in the collective mind of the jury."

The defendant's objection appears to be that the judge did not define the "presumption of innocence." He cites *Commonwealth* v. *Drayton, supra,* to support this position. We stated in *Commonwealth* v. *Drayton, supra* at 46: "[W]e have held that judges need not give any particular content to the phrase 'presumption of innocence,' if the instructions make clear that an indictment does not imply guilt, and that the jury must base their decision on the evidence, and not on 'suspicion or conjecture.' *Commonwealth* v. *DeFrancesco,* [248 Mass. 9, 13 (1924)]. *Commonwealth* v. *Boyd,* [367 Mass. 169, 188-189 (1975)]. *Commonwealth* v. *Powers,* 294 Mass. 59, 63-64 (1936)."

Clearly, the judge here instructed the jury in compliance with the mandate in *Drayton.* As the adequacy of instructions must be determined in light of their over-all impact on the jury, *Commonwealth* v. *Murray,* 396 Mass. 702, 705 (1986), we view the charge in its entirety, and we conclude there was no error in the instructions as given.

5. *Review under G. L. c. 278, § 33E.* The defendant admits that, from the evidence presented and admitted, the jury were warranted in returning verdicts of guilty. He argues, however, that justice requires a new trial because the verdicts might have been different, had the judge granted his requests to exclude certain evidence and to give certain instructions. For the reasons stated, we conclude there was no error in the judge's evidentiary rulings or jury instructions. There is no merit to the defendant's argument that the "cumulative effect of what the defendant alleges to be error" warrants our ordering a new trial. On consideration of the whole record of this case, we see no reason to exercise our power under G. L. c. 278, § 33E, either to order a new trial on the murder indictment or to direct the entry of a verdict of a lesser degree of guilt.

*Judgments affirmed.*