### COMMONWEALTH vs. PAUL DUNN.

Middlesex. May 8, 1990. - July 3, 1990.

Present: LIACOS, C.J., ABRAMS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Homicide. Constitutional Law*, Waiver of constitutional rights, Admissions and confessions. *Search and Seizure*, Affidavit. *Waiver. Evidence*, Relevancy and materiality. *Practice, Criminal*, Argument by prosecutor.

At a first degree murder trial, after a hearing on the defendant's motion to suppress his statements to police, the judge correctly ruled, on the evidence presented, that the defendant had made a knowing, voluntary and intelligent waiver of his Miranda rights and that he then freely and voluntarily made incriminating statements to the police. [804-806]

Where a defendant charged with murder made voluntary statements to police after a knowing, intelligent and voluntary waiver of his Miranda rights, items seized pursuant to a search warrant obtained on the basis of the defendant's statements were correctly received in evidence. [806]

Evidence in a murder trial that the victim was pregnant was properly admitted, as it was highly probative on the issue of the defendant's motive to kill her, and any chance of prejudice was minimized by a limiting instruction to the jury. [806-807]

At a murder trial, no substantial likelihood of a miscarriage of justice resulted from the prosecutor's closing remarks in which the prosecutor compared the statements made by the defendant to his psychiatric experts with the other evidence in the case, where the argument did not constitute an impermissible comment on the defendant's credibility but was rather designed to refute the opinion of the defendant's experts on the issue of criminal responsibility. [807-809]

INDICTMENT found and returned in the Superior Court Department on October 2, 1986.

A pretrial motion to suppress evidence was heard by *Robert A. Barton*, J., and the case was tried before him.

*John C. McBride* for the defendant.

*LaDonna J. Hatton*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. A jury in the Superior Court convicted the defendant of murder in the first degree. The victim was the defendant's wife, Pamela Nigro Dunn. On appeal, the defendant argues error in (1) the denial of his motion to suppress statements made by him after his arrest and evidence seized during a search of his apartment and automobile; (2) the admission of testimony by a pathologist that an eighteen to twenty-two week old fetus was found in the victim's body during the autopsy; and (3) statements made by the prosecutor in closing argument. We reject the defendant's arguments and find no basis for relief pursuant to G. L. c. 278, § 33E (1988 ed.). Consequently, we affirm the conviction.

The jury heard evidence of the following. The victim and the defendant were married in January, 1986. During the spring of 1986, the defendant told Christine Grant, with whom he had had a prior relationship, and Lillian Mason, with whom he was then having a relationship, that his wife was pregnant, and that he thought someone else was the father. From the end of April through August, 1986, the defendant repeatedly told both Grant and Mason that he wanted to kill his wife. In June, he told Grant that he wanted to kill the baby by kicking his wife in the stomach and causing a miscarriage; and he asked Mason to get him a gun. In July, he asked Grant to get him a gun so that he could shoot his wife, and he told Grant that after he killed his wife, he and Grant would go to Canada.

In July, the defendant drove with Mason to the victim's place of employment, then drove the bus route the victim would take home, and then drove to where the victim was living with her parents. The defendant told Mason that, if he saw his wife or her former boyfriend while they were driving, he would kill them. He said he would grab his wife and put her in the back seat while Mason drove the car, and that he would kill his wife slowly with a knife, then take her body to Charlestown, put it in a green garbage bag, stick it in the trunk, and drop it in a dumpster. The defendant told Mason that after he killed his wife, he and Mason would go to California, then to Florida.

The defendant bought a .45 caliber "thirty-shot commando" rifle on August 7, 1986.

On August 15, 1986, the victim was working at a Bradlee's department store in Union Square, Somerville. Around 5 P.M., the defendant went to Bradlee's and was seen arguing with the victim. The victim called her mother around that time and sounded very nervous.

The defendant called Mason between 8 P.M. and 8:30 P.M. that evening and told her that he had had a "yelling match" with his wife earlier, and that he was waiting in Union Square for his wife to get out of work. He told Mason that he had a gun and planned to kill his wife that weekend. Mason testified that the defendant's speech sounded fine at that time.

The victim left work with a friend at 9:30 P.M. A witness, standing at a bus stop across from Bradlee's at the time, saw the victim point out a passing car to her friend. That same car drove slowly by the bus stop while the victim was waiting for the bus, causing her to become visibly nervous and upset.

The victim's mother, Carol Nigro, met the victim near the bus stop at the end of the bus route in Arlington at approximately 10 P.M. The victim was still nervous and upset. As they began walking home, Nigro saw the defendant's car parked on the wrong side of the street. As Nigro and the victim passed the defendant's car, he jumped from behind the car and yelled at the victim, "What's this about welfare? We're going to talk and we're going to talk now."

On the morning of August 16, 1986, the victim's body was found lying face down in a puddle in the Lexington town dump. An autopsy conducted later that day revealed the presence of two gunshot wounds (one entry, one exit), three stab wounds, and abrasions of the neck. The cause of death was determined to be a gunshot wound to the back associated with multiple stab wounds, strangulation, and submersion.

The defendant telephoned Lillian Mason one and one-half weeks after the murder and told her that he had shot, stabbed, and strangled his wife, but that he had not drowned

her. He told Mason not to talk to the police. The defendant then telephoned Christine Grant. He told Grant that he had waited for his wife on a corner, and having seen her and her mother, went over to talk to his wife about welfare. The women began fighting with him, and he sprayed the mother with mace and shot his wife with a rifle. He told Grant that he then dragged the victim to the car, stabbed her, and strangled her, but that he did not drown her. He said that he dropped her body at the Lexington dump, and that her face must have landed in a puddle. The defendant told Grant that he had guns and a knife with him, that he had painted his automobile black and changed the registration plate, and that the automobile had blood on the seat. The defendant told Grant that, if she talked to the police he would kill himself, and she would get what she deserved. The defendant also told Grant that he was scared the police would catch him. The defendant was arrested in Florida on a warrant on November 14, 1986.

1. *Statements incident to arrest.* The defendant argues that the judge erred in admitting in evidence statements made at the time of his arrest because he did not knowingly and voluntarily waive his Miranda rights. Specifically, the defendant argues that, at the time of his arrest, he was under the influence of various intoxicants including beer, wine, and marihuana.

During the hearing on the defendant's motion to suppress, evidence was introduced that on November 14, 1986, Trooper Joseph F. Flaherty of the Massachusetts State police and Sergeant James Moran of the Arlington police went to Jacksonville, Florida, to arrest the defendant on an arrest warrant for murder. The officers set up a surveillance of the defendant's apartment at approximately noon on November 15. Sergeant Moran saw the defendant walk into his apartment building at approximately 5 P.M. At approximately 5:20 P.M., the officers saw the defendant leave his apartment carrying two six-packs of empty bottles, and walk up the street toward a 7-Eleven store. The defendant was walking with a normal gait.

The officers then arrested the defendant. His hands were handcuffed behind his back, and Agent John Farmer of the Florida Department of Law Enforcement (FDLE) said, "You're under arrest." He was then placed in the back seat of an FDLE cruiser. Trooper Flaherty read the defendant his Miranda rights from a printed card. The defendant immediately stated that he understood those rights and would like to speak to the officers. At this time, Trooper Flaherty did not smell any alcoholic beverage on the defendant's breath, and his speech was clear — he did not appear to be under the influence of alcohol.

Trooper Flaherty asked the defendant where the gun was, and he responded that it was in a closet in his apartment and that it was unloaded. The defendant described the gun as a .45 caliber thirty-shot commando rifle. Trooper Flaherty then asked the defendant if there were any other weapons in the apartment, and the defendant responded that there was ammunition, a magazine clip, as well as a machete-type knife, which was in the dresser drawer. Trooper Flaherty asked the defendant if he would consent to a search of his apartment. The defendant stated that he would rather be with the officers if they were going to search his apartment. Trooper Flaherty then got out of the car, and discussed obtaining a search warrant with Agent Farmer. The defendant overheard them and said, "If you're going to get a warrant anyway, then go ahead and search the apartment."

Sergeant Moran got in the back seat of the cruiser with the defendant and introduced himself as a police officer. The defendant said, "I'm glad it's over." The defendant then said that once he started reading the "First Testament," he knew he had to be caught. The defendant stated that he did not know the gun was loaded, and that he had practiced for two or three days with the gun before he shot her. The defendant also told Sergeant Moran that he had had a dream a few weeks before he was arrested and it (the dream arrest) happened just like this, only he was carrying bundles and not bottles in his arms.

Trooper Flaherty and another FDLE special agent then got into the cruiser with Sergeant Moran and the defendant and took the defendant to FDLE headquarters. During the drive, the defendant said that he could not believe it had happened; "it was like a nightmare."

After taking the defendant into the police station, Trooper Flaherty again read the defendant his Miranda rights from a card. He told the defendant to read the card, and date and sign it if he wished to talk to the officers. The defendant signed the card. In response to further questions at the station, the defendant said that one thing he learned in college was never to defend yourself in a serious matter like this. At that time, Trooper Flaherty noticed that the defendant's eyes were clear, that his speech was clear, and that he had no odor of alcohol on his breath.

While executing a search warrant of the defendant's apartment, the officers found the gun, ammunition, magazine clip, and knife in the exact locations indicated by the defendant.

The defendant testified that he was twenty-four years old, that he had received an associate's degree from Bunker Hill Community College, and that he had been in the Marine Reserve for four years. He testified that in August, 1986, he was employed as a housekeeping supervisor at Lawrence Memorial Hospital and was a contract cleaner for a company called Lampco.

The defendant testified that he left Medford on August 15, 1986, the day of this offense, and arrived in Jacksonville, Florida, on August 18, 1986. He stated that he drank beer and smoked marihuana regularly while in Florida. He also stated that he tried to kill himself on three separate occasions while in Florida, and wrote five suicide notes on August 21, 1986. The defendant remembered the specific dates and methods of the alleged suicide attempts. He testified that on August 19, 1986, he tried to hang himself with a tie; that in early September, 1986, he ingested thirty-six sleeping pills; and that in mid-October, 1986, he ingested fifty Advil pain killers, thirty-six sleeping pills, and drank vodka.

The defendant specifically remembered various details about the night before and the day of his arrest and testified about those details. The defendant also specifically remembered that, at the time of his arrest, one of the FDLE special agents identified himself and said, "You're under arrest." He remembered being read his rights, but stated that he did not understand them fully. He remembered Trooper Flaherty's asking him what weapons were in the apartment, and telling him that there was a rifle, a machete-type knife, and a set of "nunchucks." He recalled that there was a discussion about whether the officers would obtain a search warrant to search his apartment. He remembered telling the police officers that this was like a nightmare. He remembered being taken to FDLE headquarters in the cruiser with one officer sitting in the back with him and two in the front.

Following the hearing on the motion to suppress, the judge ruled that the defendant had made a knowing, voluntary, and intelligent waiver of his Miranda rights, and that the defendant's statements to the police were made freely and voluntarily. In his memorandum of decision, the judge found that immediately following the defendant's arrest and before the officers asked him any questions, Trooper Flaherty read the defendant his Miranda rights from a preprinted card, and the defendant indicated that he understood those rights. The judge found that the defendant did not appear to be under the influence of drugs or alcohol when arrested, and, although somewhat nervous, did not appear hysterical, confused, or uncooperative. The judge noted that the defendant suffered no physical or psychological coercion or duress at any time during custody. Finally, the judge found that the fact that the defendant had not been arrested previously was mitigated by his statement that he learned in college to consult an attorney in serious matters like this.

In an appellate court's examination of a judge's determination that a defendant has validly waived his Miranda rights and voluntarily made statements to the police, the judge's subsidiary findings of fact supporting the determination will not be disturbed absent clear error. *Commonwealth* v.

*Yesilciman,* 406 Mass. 736, 743 (1990). Moreover, we accord substantial deference to the judge's ultimate findings. *Commonwealth* v. *Doucette,* 391 Mass. 443, 447 (1984). Where there is conflicting testimony, the judge's resolution of the conflict will be accepted. *Commonwealth* v. *Yesilciman, supra.* The judge, of course, need not believe the defendant's testimony. *Commonwealth* v. *Day,* 387 Mass. 915, 918 (1983).

Here, the judge's findings and conclusions are amply supported by the record. The testimony of Trooper Flaherty and Sergeant Moran supports a finding that the defendant was aware of the events around him and able to respond in a normal and coherent manner. He appeared to be steady on his feet, *Commonwealth* v. *Doyle,* 377 Mass. 132, 136 (1979), with clear speech, *Commonwealth* v. *Wills,* 398 Mass. 768, 776 (1986), clear eyes, and no smell of alcoholic beverage on his breath. *Commonwealth* v. *Lanoue,* 392 Mass. 583, 587 (1984). He appeared to understand what was said to him — after Trooper Flaherty read him his Miranda rights, he stated that he understood those rights and wanted to speak. The officers were entitled to rely on the defendant's outward behavior when deciding whether to proceed with the interrogation. *Commonwealth* v. *Lanoue, supra* at 589.

Moreover, the defendant responded appropriately to the questions put to him. Asked where the gun was located, he responded that it was in the closet in his apartment, unloaded, and described the gun as a .45 caliber thirty-shot commando rifle. Asked if there were other weapons in the apartment, he responded that there was ammunition, a magazine clip, and a machete-type knife, specifying that the knife was in a dresser drawer. At no time did the defendant indicate to the officers that he was under the influence of drugs or alcohol or that he did not want to speak any further. *Commonwealth* v. *Wills, supra* at 776. Conflicting testimony on the issue of the defendant's sobriety and capacity was resolved by the judge against the defendant. His resolution will not be disturbed. There is no error shown on this aspect of the appeal.

2. *Items seized pursuant to warrant.* The defendant argues that the search warrants obtained by police for the search of his apartment and automobile were based on affidavits of the statements unlawfully obtained from him after his arrest and, therefore, any evidence seized pursuant to those warrants must be suppressed. There were two search warrants obtained, one for the defendant's car and one for his apartment. But as a preliminary matter, the defendant's statements were not included in the affidavit supporting the application for the search warrant for his automobile. Therefore, the defendant's argument in reference to the automobile search must fail. And because the defendant's statements were made after a knowing, intelligent, and voluntary waiver of his Miranda rights, and were otherwise voluntary, his argument in reference to the affidavit in support of the application for a warrant for the apartment search must also necessarily fail.

3. *Evidence of the victim's pregnancy.* The defendant argues that the judge erred in admitting in evidence the pathologist's testimony regarding an eighteen to twenty-two week old fetus found in the victim's body during the autopsy.[1] The defendant claims that that evidence was irrelevant and prejudicial. We disagree because the evidence was directly relevant to the defendant's motive.

---

[1] At oral argument, appellate counsel, who was also trial counsel, stated that the evidence in the case contained "a picture of — what was characterized . . . as Baby Boy Dunn, an 18-22 week old fetus." A moment later counsel stated that "the autopsy report was admitted in evidence . . . [and contained] pictures of the . . . fetus . . . or diagrams." This argument came as a surprise to the court because the defendant's brief makes no mention of any picture or diagram of the fetus. The brief addresses only the pathologist's *testimony* about the victim's pregnancy.

The record we have does not indicate that any picture or diagram of the fetus was introduced in evidence. Nor was the autopsy report introduced in evidence. The pictures that were introduced were pictures of the victim only. We consider the oral argument by defendant's counsel to have misrepresented the record, possibly in violation of S.J.C. Rule 3:07, DR 1-102 (A)(4) and DR 7-102 (5), as appearing in 382 Mass. 768 (1981). See also S.J.C. Rule 3:22A, DF 15, as appearing in 377 Mass. 933 (1979).

Evidence is relevant if it has a rational tendency to prove a material issue. *Commonwealth* v. *Tobin*, 392 Mass. 604, 613 (1984). Whether evidence is relevant in any particular instance, and whether the probative value of relevant evidence is outweighed by its prejudicial effect, are questions within the sound discretion of the judge. *Id.* Moreover, the judge's determination of these questions will be upheld on appeal absent palpable error. *Commonwealth* v. *Harvey*, 397 Mass. 351, 359 (1986). *Commonwealth* v. *Booker*, 386 Mass. 466, 470 (1982).

Here, Christine Grant testified that in May, 1986, the defendant told her that his wife was pregnant, and that he thought someone else was the father. She further testified that each time she spoke to the defendant in June, he told her that he wanted to kill the baby. Specifically, the defendant told Grant that he wanted to kill the baby by kicking his wife in the stomach and causing a miscarriage. Similarly, Lillian Mason testified that the defendant told her that his wife was pregnant and that he thought someone else was the father. Thus, evidence that the victim was pregnant at the time the defendant killed her, taken with the defendant's statements to Grant and Mason that someone else was the father, was clearly relevant in proving motive.[2] Cf. *Commonwealth* v. *Borodine*, 371 Mass. 1, 8 (1976), cert. denied, 429 U.S. 1049 (1977). Because the evidence admitted was highly probative on the issue of motive, and the chance of prejudice was minimized by a specific limiting instruction, we cannot say on the record before us that the judge's decision to admit the testimony was in palpable error.

4. *Prosecutor's closing argument.* The defendant claims that the prosecutor, during closing argument, impermissibly attacked his credibility by insinuating that his statements to psychiatric experts should be considered as substantive evidence. Since he did not object on these grounds at the time

---

[2] Moreover, the trial judge gave a limiting instruction cautioning the jury to consider the testimony only on the issue of the defendant's state of mind at the time of the crime. See *Commonwealth* v. *Imbruglia*, 377 Mass. 682, 695-696 (1979).

of trial, we examine the defendant's claims only to determine whether there is a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Redding,* 382 Mass. 154, 155 (1980). Viewing the prosecutor's remarks in the light of his entire argument and the evidence presented at trial, see *Commonwealth* v. *Nordstrom,* 364 Mass. 310, 314 (1973), we find no merit in the contention.

At trial, the defendant admitted that he killed his wife in the manner alleged. His sole defense was lack of criminal responsibility. The defense relied heavily on psychiatric testimony and, in particular, on the testimony of Dr. Leonard Friedman, a psychiatrist. The defendant did not testify.

Throughout his closing argument, the prosecutor argued that Dr. Friedman's conclusion that the defendant may not have been criminally responsible when he killed his wife was incorrect and that, in fact, as the Commonwealth's expert had concluded, the defendant was sane. The prosecutor did this in part by comparing statements made by the defendant to his psychiatric experts with the other evidence in the case. See *Commonwealth* v. *Johnson,* 374 Mass. 453, 459 (1978).

The defendant cites several instances where the prosecutor allegedly attacked the defendant's credibility: (1) in reference to the defendant as one "who's going to tell you over, and over, and over, 'It's not my fault' "; (2) in reference to what the defendant told his experts about how he ended up in Florida; (3) in reference to what the defendant told his experts about strangling his wife; (4) in reference to what the defendant told his experts about his avoiding the police; and (5) in reference to what the defendant told his experts about his knowledge of the Bible. In every instance, the prosecutor was arguing against the testimony of the defendant's experts — not against the defendant — on the decisive issue of criminal responsibility.

To be more specific: The prosecutor's reference to the defendant's saying over and over it was not his fault was made in the context of showing that Dr. Friedman did not talk to anyone but the defendant, whose statements to his experts were inconsistent with the other evidence presented. The

prosecutor's reference to what the defendant told his experts about how he ended up in Florida, comparing those statements to the defendant's statements to others, was made in the context of arguing that the defendant was not insane, but in fact killed his wife with deliberate premeditation. The prosecutor's reference to what the defendant told his experts about his strangling his wife, comparing those statements to the defendant's statements to others, was made in the context of arguing that the defendant was not insane, but had killed his wife with extreme cruelty or atrocity. The prosecutor's reference to what the defendant told his experts about avoiding the police, comparing those statements to the defendant's statements to others, was made in the context of arguing that the defendant appreciated the wrongfulness of his actions. The prosecutor's reference to what the defendant told his experts about his knowledge of the Bible, comparing those statements to the defendant's statements to others, was made in the context of arguing that the information the defendant's experts relied on was inconsistent with the other evidence presented. None of the argument constituted impermissible comment on the defendant's credibility or an effort to turn statements he had made to his doctor into substantive evidence. Rather, the argument was designed to refute the opinion of the doctor on the issue of criminal responsibility, and as such was proper.

5. *Review under G. L. c. 278, § 33E.* We have reviewed the entire record in fulfilment of our duty under G. L. c. 278, § 33E. We discern no basis to change the jury's verdict of murder in the first degree. The evidence of the defendant's sanity and his deliberate premeditation and extreme atrocity or cruelty in connection with the homicide was compelling. There is no substantial likelihood that a miscarriage of justice has occurred.

*Judgment affirmed.*