COMMONWEALTH *vs.* FRANCIS FALLON.

No. 94-P-606.

Suffolk. November 7, 1994. - April 7, 1995.

Present: FINE, GILLERMAN, & IRELAND, JJ.[1]

Further appellate review granted, 420 Mass. 1105 (1995).

*Evidence*, Prior misconduct, Relevancy and materiality, Expert opinion. *Contempt. Constitutional Law*, Self-incrimination.

At the trial of indictments for larceny and fraud, the judge erred in allowing references to and evidence of the defendant's having been found in contempt and incarcerated in a civil proceeding for his failure to provide a satisfactory accounting of the assets he was charged with stealing, where the evidence unfairly prejudiced the defendant and where the judge did not give any cautionary or limiting instructions. [372-374]

At a criminal trial, testimonial and documentary evidence previously obtained from the defendant under court order in a related civil case was properly admitted in evidence and violated no constitutional rights of the defendant against self-incrimination, where the documentary evidence was nontestimonial and where the testimonial evidence was voluntarily given after the judge in the civil matter informed the defendant of his constitutional rights and the defendant did not then invoke them. [374-375]

Testimony of an expert witness for the Commonwealth in a complex larceny and fraud case was properly admitted. [375]

INDICTMENTS found and returned in the Superior Court Department on February 21, 1992.

The cases were tried before *Barbara J. Rouse*, J.

*Barbara A.H. Smith* for the defendant.

*William J. Duensing*, Assistant Attorney General, for the Commonwealth.

IRELAND, J. The defendant appeals from his conviction by a Superior Court jury on indictments charging larceny over $250 (sixteen counts) and securities fraud (one count). The

---

[1]Justice Fine participated in the deliberation on this case prior to her retirement.

indictments were the result of the defendant's activities stemming from a 1987 agreement between him, as principal of B.S.I. Financial Services Corp. (B.S.I.), and the victim, Lillian DiCarlo, under the terms of which he was to invest and manage the victim's assets — worth some $3.6 million.

On appeal, the defendant claims the following reversible errors: (1) those portions of the Commonwealth's opening statement and closing argument to the jury, in which the prosecutor stated that the defendant had been held in civil contempt and then imprisoned for two months in an earlier civil suit brought against him by the victim, together with evidence thereof, were improper; (2) the Commonwealth's introduction of testimonial and documentary evidence obtained from the defendant under court order in the earlier civil suit was improperly admitted; and (3) the Commonwealth's development of testimony from a witness concerning his impressions of the terms and possible legal effects of the 1987 agreement between the defendant and the victim was improperly admitted. In addition the defendant claims that the aggregate of the three errors just described rendered the entire proceedings against him fundamentally unfair.

We summarize the facts which the jury could have found from the evidence. The defendant was the principal of B.S.I. and provided financial planning services. The victim, Lillian DiCarlo, had known the defendant for many years and selected him to handle her financial affairs with respect to funds she received from the sale of real estate she had inherited as sole legatee under her late husband's will.

On December 3, 1987, Lillian DiCarlo and three of her five children, Alice Cataldo DiCarlo, William DiCarlo and Peter DiCarlo, executed an agreement with the defendant, as principal of B.S.I.[2] The agreement was to be revocable within the first year, but thereafter, for a period of thirty years, the defendant would retain exclusive control over the

---

[2]The victim's other two children, Joseph DiCarlo and Michael DiCarlo opposed their mother's sale of the real estate and did not join in the agreement with the defendant. Each elected to take his share of the proceeds outright as a $336,000 cash payment.

victim's assets. The agreement further provided that Lillian, Alice, Peter and William were each to receive $1,600 monthly and each could withdraw up to $40,000 as a "gift." When the agreement was executed, Lillian was 79 years old. Hence, the defendant was given exclusive control over her assets until she reached the age of 109 years, sometime in the year 2009. On December 4, 1987, the day after the agreement was executed, a check for $3,663,741, payable to Lillian DiCarlo and covering the proceeds of the sale of real estate, was deposited in the defendant's name in a Bank of Boston account entitled "Lillian DiCarlo's Escrow Account, Francis X. Fallon, Agent."

Over the next two years, the victim received several monthly payments of $1,600. She also received statements from the defendant on B.S.I. stationery showing, among other transactions, the disbursement of gifts by Fallon of $10,000 to William and Dale DiCarlo, of $30,000 to William DiCarlo and of $40,000 each to Alice Cataldo DiCarlo, Peter DiCarlo and Lillian DiCarlo.[3] By December, 1989, Lillian became apprehensive and suspicious, as the types of investments shown on the statements she received did not make sense. "The money was going down, but nothing was coming to me," she stated. She demanded the return of her money. When Fallon refused, she hired an attorney and filed suit in Superior Court in June, 1990, against the defendant and B.S.I. The suit also named as defendants her children, William, Peter and Alice DiCarlo, who supported Fallon and who did not want the 1987 agreement upset.

During pretrial discovery in the civil suit, the defendant was repeatedly asked to provide B.S.I. documents and records of the transactions involving the victim's assets. Upon encountering resistance and occasional outright refusal, the victim finally sought and obtained an order from a Superior Court judge compelling the defendant to produce the re-

---

[3] Lillian DiCarlo testified that, in fact, she never received $40,000 from the defendant.

quested documents and to appear for a deposition. The order was entered November 1, 1990.[4]

In response, the defendant provided certain incomplete records which failed to comply fully with the judge's November 1 order.[5] After a hearing on a motion for sanctions under Mass.R.Civ.P. 37(b), 390 Mass. 1208 (1984), the defendant was deposed in three separate sessions between January, 1991, and February, 1991. In June, 1991, the defendant (without counsel) appeared for a hearing on whether he should be held in contempt for his continued failure both to answer deposition questions and to supply all of the requested records.[6] The defendant was found in civil contempt and, in the summer of 1991, was committed to the Suffolk County jail for two months. A default judgment was entered against the defendant in the civil action (a fact *not* revealed to the jury in the criminal trial). The victim did not recover any of her money.

During the criminal trial in 1993, the Commonwealth introduced numerous bank records, charts and (over defense objections) portions of the defendant's deposition testimony and testimony from a contempt hearing — all tending to show a series of complex, convoluted transactions that placed the victim's funds beyond her reach. The Commonwealth introduced additional financial records to show a scheme on the defendant's part to create misleading "paper trails" that

---

[4]The order required the defendant to produce all relevant documents and a complete accounting of what had been done with the victim's funds including (1) whether any of the funds had been disbursed and, if so, to whom and for what reason; (2) where the funds were invested or reinvested; and (3) to whom the proceeds from any investments or reinvestments had been distributed. The defendant was also required to appear for a deposition to be arranged by the victim's counsel.

[5]For example, the defendant supplied copies of the faces of checks drawn on the victim's account, many of which had been made out to multiple payees, but failed to supply copies of the backs of the checks, thus making it impossible to identify the endorsements.

[6]As reasons for refusing to disclose information, the defendant reasserted certain confidentiality provisions contained in his agreements with other third-party investors, provisions which he claimed precluded him from revealing the identity of these parties, in whom he had made investments out of the victim's funds.

made it virtually impossible to track the victim's funds. The Commonwealth also introduced evidence that the defendant, at times, used the victim's money directly for his own purposes as, for example, his purchase and redevelopment of property at 91-93 Beach Street, Revere, and his deposit of funds into the account of several small businesses controlled by him. The defendant's former accountant, Robert Farrell, who left B.S.I. in 1988 to set up his own company, received a $100,000 loan from B.S.I. — interest-free for thirty months — out of the victim's funds. Finally, the Commonwealth produced evidence that the pattern of sham transactions quickened just after the victim demanded her money in 1990. During the six-month period following the filing of suit, some $600,000 of the victim's funds were transferred to the defendant and to related parties, and, on the same day suit was filed, the defendant paid from the victim's assets a $100,000 penalty for early withdrawal of a certificate of deposit representing part of the victim's funds. Following five days of trial, the jury, on September 17, 1993, returned guilty verdicts on all the indictments.

1. *Reference to civil contempt and previous incarceration.* On the first day of trial, prior to opening statements, defense counsel objected to the Commonwealth's stated intention to refer to the defendant's having been found in civil contempt and incarcerated as a result. Defense counsel also objected to any reference being made to the findings or rulings of the judge in the civil matter on the contempt issue. Both objections were based on claims of undue prejudice and the alleged absence of any probative value. The judge permitted the Commonwealth to inform the jury during its opening statement that, in response to the judge's order in the civil suit, the defendant produced some documents but kept others, claiming they were confidential, and that, thereafter, the defendant was found in civil contempt and was imprisoned for two months.[7] Once the jury had been told of the defendant's previous incarceration for civil contempt, defense

---

[7] In its opening remarks, the Commonwealth stated: "[T]he defendant was held in contempt because he wouldn't tell [the victim] where the

counsel sought to control the damage by confronting the issue head on during his cross-examination of the attorney who had handled the victim's civil case.[8] Other than this exchange, there was no testimonial or documentary evidence offered by the Commonwealth as to the actual contempt finding or the incarceration. In its closing remarks, however, the Commonwealth again made reference to the defendant's imprisonment.[9]

The judge instructed the jury that opening statements and closing arguments are not evidence. The judge then explained that a lesser standard of proof is required in a civil trial. Next, the judge briefly explained the process of discovery in a civil case and stated that the judge in the civil case

---

money went and he went to jail for two months in the summer of 1991, because he wouldn't tell [the victim] where the money was."

[8]The following exchange took place between defense counsel and the witness:

> DEFENSE COUNSEL: "Now, ultimately, after all these depositions, and after the contempt hearing with [the civil trial judge], the bottom line was that [the judge] found Mr. Fallon in contempt, is that right?"
>
> THE WITNESS: "That's correct."
>
> DEFENSE COUNSEL: "Sent him to jail for sixty days, is that right?"
>
> THE WITNESS: "Correct."
>
> DEFENSE COUNSEL: "And Mr. Fallon said I'll gladly go, didn't he?"
>
> THE WITNESS: "I don't think he said that."
>
> DEFENSE COUNSEL: "Did he say: I'm standing up for a principle and, by God, I'll go for as long as I have to?"
>
> THE WITNESS: "He never said that."
>
> DEFENSE COUNSEL: "You never heard him say that?"
>
> THE WITNESS: "I never heard him say that."
>
> DEFENSE COUNSEL: "I've no further questions [at this time.]"

[9]The Commonwealth stated: "And under what principle is it that he's allowed to not tell [the victim] where the money is when a Civil Judge says give it back? This defendant went to jail for two months for one and only one reason. [B]ecause he had a million and a half of [the victim's money] and he didn't want to give it back. That's why he went to jail."

On defense request, the judge instructed the jury that, because there was no evidence in the civil case that the defendant had been ordered to give the victim's money back, the jury was not to consider that statement.

had ordered the defendant to produce documents during that process and that, owing to the defendant's failure to comply fully, various sanctions were imposed on him. Finally, the judge instructed the jury: "[Y]ou may evaluate the civil case and the evidence concerning it to the extent that you find it's probative or relevant on any of the elements of the crime charged here."

We think the defendant was unfairly prejudiced by reference in the Commonwealth's opening statement and closing argument to the defendant having been held in civil contempt and, in particular, to his having been incarcerated. Although the actual evidence of these matters was introduced by the defendant during his cross-examination of a Commonwealth witness, we believe that the defendant's action was a legitimate trial tactic aimed at limiting the damage from the judge's ruling permitting the Commonwealth to refer to the matter in its opening statement. The judge gave the Commonwealth a green light to develop evidence on the issue. Knowing not when, or how, the sharp axe of that evidence might fall, the defendant obviously believed he might soften the blow by setting the time and manner himself. On direct examination, the witness for the Commonwealth (the victim's attorney at the contempt hearing) had testified in considerable detail about the civil contempt hearing itself. The defendant's cross-examination of the witness completed the picture by establishing that the defendant had been found in civil contempt and later imprisoned.

The facts and issues underlying the civil contempt finding and incarceration were closely intertwined with, yet different from, the facts and issues in the criminal trial. The defendant's incarceration for civil contempt resulted not from larceny of the victim's assets, but rather from his failure to provide a satisfactory accounting of those assets. Nevertheless, the danger was high that individual jurors might not have appreciated that distinction and, therefore, could have inferred guilt if they believed the incarceration arose from the same transactions covered by the larceny indictments. A similar problem arose in *Commonwealth* v. *Gallarelli*, 372

Mass. 573, 580 (1977). There, the defendants were held in criminal contempt for attempting to influence a juror and for interfering with the administration of justice. In their subsequent trial for conspiracy to influence a juror, evidence of the earlier contempt adjudications was introduced pursuant to G. L. c. 233, § 21, in order to impeach one of the defendants. Although the court concluded that the evidence was properly admitted under the statute, it cautioned that "a serious issue of fairness" would arise if it were shown that the jury "might . . . have inferred that the conviction for contempt arose out of the same transaction as the conspiracy indictment then on trial." *Ibid.* Unlike the situation here, the record in *Gallarelli* demonstrated that "the jury were not informed of any facts which tended to show a connection between the contempt and the conspiracy." *Id.* We are not dealing in this matter with evidence of a prior conviction admitted under c. 233, § 21, but we hold that the warning noted in *Gallarelli* applies to this situation.

Furthermore, evidence, even where highly relevant, may be excluded as within the judge's sound discretion, if its probative value is outweighed by the risk of unfair prejudice. Liacos, Massachusetts Evidence § 4.3, at 130 (6th ed. 1994), and cases cited. Balancing the probative value of particular evidence against the danger of uncorrectable prejudice is a determination to be made by the trial judge, and, absent abuse of discretion or "palpable error," will not be reversed on appeal. *Commonwealth* v. *Robertson*, 408 Mass. 747, 750 (1990). Liacos, *supra* at 132. Here, however, we think there was palpable error in allowing references to, and evidence of, the contempt finding and the defendant's incarceration, especially in the absence of any cautionary or limiting instructions. Had the evidence been accompanied by a forceful instruction, the effect of the error might have been neutralized. See *Commonwealth* v. *McGeoghean*, 412 Mass. 839, 842 (1992) (a limiting instruction "tends to offset any improper prejudicial effect of evidence that might be thought to show the defendant's bad character . . . and focuses the jury's attention on the proper application of the evidence"). See also

Liacos, *supra* at 132, citing *Commonwealth v. Dunn*, 407 Mass. 798, 807 (1990), and *Commonwealth v. Harvey*, 397 Mass. 351, 358-359 (1986).

On this basis, we think the situation here stands in marked contrast to *Commonwealth v. Helfant*, 398 Mass. 214, 224-229 (1986), where evidence of the defendant's acts of prior misconduct with two female patients — he injected them with a drug and then sexually molested them — was admitted as relevant to his disputed criminal intent. In *Helfant*, the judge instructed the jury that they could consider that evidence only on the drugging indictment, not on the rape indictment, and only for the limited purpose of proving the defendant's possible plan, scheme, or state of mind. *Id.* at 226.[10]

We believe that the same considerations should apply when weighing prejudicial effect against probative value, whether, as in *Helfant*, the evidence is of prior conduct, similar or identical in character to that being tried or, as here, is directly connected to the criminal matter at hand. See *Commonwealth v. Gallarelli*, 372 Mass. at 580. The dangers are the same: namely, that the jury may be unduly swayed by the extraneous evidence and may improperly use it to convict.

Reference beyond the civil contempt finding to the defendant's incarceration may well have left the jury with the distinct impression that, because the defendant had already been jailed in connection with the civil matter, he likely was guilty in the criminal matter as well. Admission of evidence of the civil contempt finding and of the defendant's subsequent incarceration, without cautionary or limiting instructions, was error requiring reversal of the convictions.

2. We briefly take up the defendant's other claims in the event the issues arise in a subsequent trial.

Testimonial and documentary evidence obtained from the defendant under court order in the civil case was properly

---

[10] See also *Helfant, supra* at 229 n.14, where the court again highlighted "the clarity and forcefulness of the judge's thrice-repeated instructions" and her "careful and conservative approach to the evidence."

admitted in the criminal trial and did not violate his Federal or State constitutional rights against self-incrimination. The documentary evidence, being nontestimonial in nature and not carrying with it any particular implied testimonial message, is not protected by the Fifth Amendment to the United States Constitution or by art. 12 of the Massachusetts Declaration of Rights. Compare *Commonwealth* v. *Hughes*, 380 Mass. 583, 587-595, cert. denied, 449 U.S. 900 (1980). The deposition testimony and civil contempt hearing testimony amount to voluntary testimonial admissions, given after the defendant had been told by the judge in the civil matter that he had certain constitutional rights, including the privilege against self-incrimination. He did not raise the issue of voluntariness, or otherwise invoke the privilege, in either the civil or criminal proceedings. The right against self-incrimination is not self-executing and, if not timely raised, is deemed to have been waived. See *Commonwealth* v. *Funches*, 379 Mass. 283, 289 (1979). The defendant's reliance on *Garrity* v. *New Jersey*, 385 U.S. 493, 496-500 (1967), is misplaced. There, the defendants' testimony was "coerced" in violation of their Fifth Amendment rights, because, if they had invoked those rights, they would have forfeited their jobs. Here, by contrast, the defendant faced no restraint on his unfettered right to invoke the privilege.

3. The testimony of the Commonwealth's expert witness, William Baldwin, was also properly admitted. Notwithstanding the defendant's contention, Baldwin was properly qualified as an expert, and the subject of his testimony (construing the terms and likely effects of the defendant's agreement with the victim) legitimately could have assisted the jury in their understanding of the complex issues in the case and in making their ultimate factual determinations. See *Commonwealth* v. *Lanigan*, 419 Mass. 15, 25 (1994). Opinions offered by the witness, including that the defendant engaged in self-dealing and conflict of interest, were relevant as to the issue of an over-all scheme on the defendant's part to defraud the victim.

To conclude, we rule that references made to the defendant's having been held in civil contempt and to his having been incarcerated for civil contempt were unreasonably prejudicial and constituted reversible error. There was no error in admitting the defendant's deposition and contempt hearing testimony. There also was no error in admitting the expert's testimony.

The judgments are reversed, the convictions are set aside, and the case is remanded for a new trial.

*So ordered.*