COMMONWEALTH *vs.* ROBERT HARVEY.

Middlesex.    February 4, 1986. — April 17, 1986.

Present: WILKINS, LIACOS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Constitutional Law,* Admissions and confessions, Self-incrimination. *Police,* Self-incrimination. *Evidence,* Videotape, Relevancy and materiality. *Practice, Criminal,* Judicial discretion, Instructions to jury. *Jury and Jurors.*

At the hearing on a motion to suppress certain statements made by the defendant, a police officer, during the course of an internal investigation by his superior officers concerning allegations of misconduct contained in a citizen's complaint filed against him, evidence that there had been no overt threat or direct pressure from his superiors that coerced his choosing to make the statements warranted the conclusion that the defendant had not been compelled to incriminate himself. [355-357]

At a criminal trial, the judge did not abuse his discretion in admitting, as evidence of the complaining witness's sobriety at the time he arrived at a police station, a videotape recording of the witness made while he was being placed under protective custody, in which he made four separate accusations against the defendant, where limiting instructions given by the judge were sufficient to clarify the purpose for which the evidence could properly be used. [357-359]

At a criminal trial in which the jury, during their deliberations, had made two requests for further instruction on the meaning of proof beyond a reasonable doubt but, when the judge was unable to respond to the second request promptly, because he was then presiding in another session, withdrew their inquiry and indicated that verdicts had been reached, the judge did not err in denying the defendant's request for questioning of the jury concerning the need for additional instructions, where the defendant failed to demonstrate that he had been deprived of his right to have issues of law explained to the jury, or that any prejudice to him had resulted. [359-360]

INDICTMENTS found and returned in the Superior Court Department on April 11, 1984.

A motion to suppress evidence was heard by *Robert A. Barton,* J., and the cases were tried before him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Daniel J. O'Connell, III (Eileen D. Vodoklys* with him) for the defendant.

*Karen J. Kepler,* Assistant District Attorney, for the Commonwealth.

NOLAN, J. On April 5, 1984, a Middlesex County grand jury returned two indictments charging the defendant, Robert Harvey, with larceny from the person, see G. L. c. 266, § 25 (*b*) (1984 ed.), and civil rights violations under G. L. c. 265, § 37 (1984 ed.). On August 20, 1984, the defendant's trial commenced before a judge and a jury in the Superior Court in Middlesex County. The defendant was found guilty on both indictments. He appealed to the Appeals Court. We transferred the case to this court on our own motion.

The defendant argues that (1) the judgments should be reversed and the indictments dismissed because he was compelled to furnish evidence against himself in violation of art. 12 of the Massachusetts Declaration of Rights; (2) the trial judge erred by admitting in evidence a videotape of the victim; and (3) the defendant was denied due process of law and his right to a trial by jury as a result of the judge's failure to suspend deliberations after the jury requested further instruction on the meaning of proof beyond a reasonable doubt. We find no error and affirm the convictions. The relevant facts are summarized as follows.

On March 21, 1984, the defendant was employed as a police officer by the city of Cambridge. On that date, he was working the midnight to 8 A.M. shift and was assigned to drive police wagon No. 419, which is a small, closed truck that is used by the Cambridge police department primarily to transport prisoners. At approximately 1:30 A.M., the defendant was dispatched to Cambridge City Hospital to pick up a man, later identified as Charles Dayton. Dayton was believed to be intoxicated and was in need of shelter for the evening.

At trial, Dayton testified that, when the police wagon arrived at the hospital, he stepped into the rear, believing that he would be transported to the Cambridge police station and placed in

protective custody for the evening. See G. L. c. 111B, § 8 (1984 ed.). Dayton further testified that, instead of driving him to the station, the defendant drove to a dark area (later identified as the Brown and Ferris Industries' reclamation yards in East Cambridge [BFI]) where he stopped the police wagon, opened the back door, and requested Dayton to step out. When Dayton complied, the defendant searched him, took approximately $60 in cash from him, and abandoned him. Dayton testified that he was unfamiliar with the area and began to walk in the direction of lights in the distance. After walking for approximately five minutes, he came upon a weighing station operated by a BFI employee. Dayton told the employee that he had just been "robbed by the guy in the wagon," and requested permission to telephone the police.

A short time later, Officers Lester J. Sullivan and J. Michael Walsh of the Cambridge police department arrived on the scene. The officers spoke with Dayton, placed him in their patrol car, and proceeded to the Cambridge police station. While en route to the station, the officers observed their supervisor, Sergeant Edward C. Hussey, Jr., who was in his patrol car at the intersection of Cambridge and Harding Streets. The officers stopped their cruiser and had a discussion with Sergeant Hussey regarding Dayton's allegations. The sergeant also spoke directly to Dayton.

After hearing Dayton's description of what had occurred, Sergeant Hussey radioed the defendant and requested him to report to the intersection of Cambridge and Harding Streets. The defendant complied and upon his arrival was asked by Sergeant Hussey whether he recognized Dayton. The defendant looked at Dayton, who was still seated in the patrol car, and responded affirmatively. The defendant then told the sergeant that he had removed Dayton from the hospital and, at Dayton's request, drove him to the corner of Gore and Fifth Streets in Cambridge. At this time, Dayton identified the defendant as the person who had taken his money. The sergeant requested each of the officers (Sullivan, Walsh, and Harvey) to return to police headquarters to write a report concerning the incident. All of the officers complied. The defendant's written statement was consistent with what he had told Sergeant Hussey orally.

Upon the officers' arrival at the station, the paperwork to place Dayton in protective custody was completed. This booking procedure was recorded on a videotape that was admitted in evidence at the defendant's trial for the limited purpose of showing Dayton's condition as to sobriety around the time of the alleged incident. While at the station Dayton filed a citizen's complaint with the Cambridge police department regarding the events described above.

The defendant did not testify at trial. He did, however, dispute Dayton's allegations on four separate occasions, the first two occurring, as previously described, on March 21, 1984. The defendant prepared a second written report on March 27, 1984, at the direction of Captain William Burke, the night commander. Captain Burke obtained the report from the defendant at the request of Lieutenant William D. Cummings. Lieutenant Cummings was the officer conducting the investigation of Dayton's citizen's complaint as part of his duties with the inspectional services section of the Cambridge police department. In all material respects, the second report was identical to the report prepared and submitted by the defendant on March 21, 1984.

On March 29, 1984, the defendant was interviewed by Lieutenant Cummings as part of the investigation of Dayton's complaint. The defendant's presence at the interview was arranged through a letter sent by Lieutenant Cummings to Captain Burke, "requesting that Officer Robert Harvey report to [Cummings's] office on March 29, 1984." The defendant appeared for the interview accompanied by Officer Edward Loder, president of the Cambridge patrolman's association. The interview was tape recorded. The tape was later transcribed and with the defendant's statements of March 21 and 27, 1984, admitted in evidence at the defendant's trial. We now address the defendant's arguments.

1. *The motion to suppress.* On August 6, 1984, the defendant filed a pretrial motion to suppress each of the statements that he had made regarding the events of March 21, 1984. See Mass. R. Crim. P. 13, 378 Mass. 871 (1979). The motion was heard on the same day and the judge denied the defendant's

motion. On August 10, 1984, the judge issued a detailed order outlining his findings of fact and rulings of law.[1] In denying the motion, the judge ruled that none of the statements given by the defendant was the result of a ."custodial interrogation" within the meaning of *Miranda* v. *Arizona,* 384 U.S. 436, 444 (1966).[2] See *Commonwealth* v. *Bryant,* 390 Mass. 729, 737 (1984) (factors considered in evaluating whether interrogation is custodial). He further ruled that the defendant's statements were not obtained by coercion under the threat of removal from office as exemplified by the United States Supreme Court's decision in *Garrity* v. *New Jersey,* 385 U.S. 493, 500 (1967).[3] Relying exclusively on *United States* v. *Indorato,* 628 F.2d 711 (1st Cir.), cert. denied, 449 U.S. 1016 (1980), the judge ruled that the defendant's "subjective fear that he would be dismissed [from office] if he refused to give the statements under consideration [did] not demonstrate that these statements were coerced."

The defendant argues that, in ruling on the motion to suppress, the judge erred by "confin[ing] his analysis to federal constitutional principles." As we understand it, the thrust of the defendant's claim is that a statement may be considered sufficiently voluntary so as to survive a challenge under the

---

[1] The defendant has adopted the majority of the judge's findings of fact for purposes of this appeal.

[2] In his brief, the defendant has not advanced the argument that his statements were the result of a custodial interrogation in violation of *Miranda* v. *Arizona, supra,* but rather contends that the statements were "compelled" in violation of art. 12. Accordingly, we do not address the *Miranda* issue.

[3] In *Garrity* v. *New Jersey, supra,* the appellants were police officers who were being investigated by the State Attorney General as part of an inquiry into alleged irregularities in the handling of cases in the New Jersey Municipal Courts. *Id.* at 494. Before being questioned, each officer was warned, "(1) that anything he said might be used against him in any state criminal proceeding; (2) that he had the privilege to refuse to answer if the disclosure would tend to incriminate him; but (3) that if he refused to answer he would be subject to removal from office." *Id.* The Supreme Court stated that the choice the officers were given "was either to forfeit their jobs or incriminate themselves." *Id.* at 497. The Court ruled that statements obtained in this manner "were infected by the coercion inherent in this scheme of questioning and cannot be sustained as voluntary." *Id.* at 497-498.

Fifth and Fourteenth Amendments to the United States Constitution, but still be regarded as "compelled" under art. 12.[4] Although such might be the case, we need not decide the issue at this time, since there is nothing in the record before us to indicate that the defendant was "compelled to accuse, or furnish evidence against himself."

We acknowledge that the defendant was required by the rules of the Cambridge police department to obey the lawful orders of his superior officers, and that this imposed upon him an obligation to answer questions regarding his duties as a police officer. See *Silverio* v. *Municipal Court of the City of Boston,* 355 Mass. 623, 626, cert. denied, 396 U.S. 878 (1969). We further understand that the defendant prepared his second written statement and attended the interview before Lieutenant Cummings while the defendant was the subject of a citizen's complaint. Furthermore, it is clear that the defendant may have faced disciplinary proceedings, which ultimately could have resulted in his dismissal, if he refused to answer pertinent questions during the investigation.[5] However, the fact that there existed the possibility of adverse consequences from the defendant's failure to cooperate does not demonstrate that the defendant was "compelled" to incriminate himself. The

---

[4] The defendant correctly recognizes that "[w]e have consistently held that art. 12 requires a broader interpretation than that of the Fifth Amendment." See *Attorney Gen.* v. *Colleton,* 387 Mass. 790, 796 (1982). We do not retreat from that position today. The cases upon which the defendant relies have principally dealt with the "scope of immunity necessary to displace the privilege under Massachusetts law." *Id.* at 792. *Emery's Case,* 107 Mass. 172, 185 (1871).

[5] It is not clear from the record the extent to which officers were disciplined for refusing to cooperate with internal investigations. The testimony of Lieutenant Cummings in response to an inquiry from the judge is conflicting on this point:

THE JUDGE: "Have you ever known anybody who refused to answer questions that wasn't disciplined?"

THE WITNESS: "No."

THE JUDGE: "Has anybody refused to answer?"

THE WITNESS: "Not that I know of."

THE JUDGE: "So has anybody been disciplined for not answering?"

THE WITNESS: "Not that I know of, no."

defendant has not argued that there was any overt threat or direct pressure from his superiors that coerced his choice. He was not told that he would be discharged if he refused to cooperate on grounds of self-incrimination. See *United Sanitation Men Ass'n* v. *Commissioner of Sanitation of the City of N.Y.,* 392 U.S. 280, 284-285 (1968). Unlike the appellants in *Garrity* v. *New Jersey,* 385 U.S. 493, 497 (1967), the defendant was not told that he had a single choice between forfeiting his employment or incriminating himself. Moreover, as found by the judge in the Superior Court, the defendant has cited no State statute or law that would "mandate his removal from office upon a failure to provide the requested statements."

The defendant made a calculated decision to provide four exculpatory statements when confronted by his superiors with allegations of misconduct. His choice was voluntary. As we stated in *Silverio, supra* at 630, "[w]e assume that [the defendant] had a right to refuse to answer . . . questions on constitutional grounds. We assume also that he could not have been discharged for claiming the privilege." See *Baker* v. *Lawrence,* 379 Mass. 322, 330-332 (1979). See also *Slochower* v. *Board of Educ.,* 350 U.S. 551 (1956). The defendant did not claim any privilege, or voice any objection; rather, he cooperated voluntarily. The choice was his own. There was no error.[6]

2. *Admission of the videotape.* The defendant next argues that the judge erred in admitting in evidence a videotape of Dayton that was made while Dayton was being placed under protective custody at the Cambridge police station. The videotape was initially offered by the Commonwealth as a prior consistent statement of the complaining witness, and as evidence of Dayton's sobriety at the time he arrived at the station.

---

[6] In *Walden* v. *Board of Registration in Nursing,* 395 Mass. 263, 270 (1985), we observed that one of the consequences under the broader protection of art. 12 — as compared to the Fifth Amendment — might include the extent to which and the manner in which a person would have to assert the protection of art. 12 in order to receive art. 12 protections. The defendant in this case is seeking to benefit from the protections of art. 12 without having made any effort to assert the privilege of art. 12 before making the statements in question. In the absence of compulsion, we are not persuaded to rule that the privilege is self-executing.

The judge ruled that the tape was inadmissible as a prior consistent statement. However, over the defendant's objection and with a limiting instruction, he admitted the tape as evidence of Dayton's condition.[7] The defendant contends on appeal, as he did at trial, that the probative value of the tape was outweighed by its prejudicial effect. See *Green* v. *Richmond,* 369 Mass. 47, 59-60 (1975).

In this videotape, in which the defendant does not appear, Dayton is shown at the booking desk. Four police officers are present during most of the interrogation. While one officer, after advising him of his Miranda rights, asked him to describe what occurred, Dayton narrated what happened from the time that he went to Cambridge City Hospital, seeking placement in protective custody, until police responded to the weighing station. Dayton did not know the name of the police officer, but referred to him as the driver of Box 419, the wagon which the defendant was operating. Dayton, in total, made four separate accusations against the defendant on the videotape. Twice he stated the defendant "took my money" and twice he said that the defendant "ripped me off." His accusations on the videotape were substantially the same as those that he made on the witness stand. These accusations had also been the subject of the testimony of the employee at the weighing station when asked to repeat what Dayton had told him.

We have consistently recognized that the decision whether the probative value of relevant evidence is outweighed by its

---

[7] The judge's instruction, in part, reads as follows: "Now, during this video tape, there is a conversation that involves Charles Dayton. Now, as far as the words of Charles Dayton are concerned, you are absolutely not to consider those words as establishing the truth of any facts contained within those words. The only reason the Court is allowing you to watch this video tape is for you to determine and give such weight as you desire as far as this video tape is concerned. You may consider it relative to his condition as to sobriety at the time this supposed interview took place. And, you may consider it, and give any weight that you desire relative to what his sobriety was within the recent hours prior to this particular interview. So again, the Court emphasizes, you are not to consider the words and the meaning of the words, as any evidence relative to what, if anything, may have occurred earlier that particular morning."

prejudicial effect is largely within the discretion of the trial judge. Moreover, that decision "will be accepted on review except for palpable error." *Commonwealth* v. *Young,* 382 Mass. 448, 462-463 (1981).

The defendant claims that the prejudice in this case was compounded by the fact that the jury were permitted to hear Dayton's out-of-court statements in a dramatic videotape presentation. We agree that there is a difference in impact when evidence is presented to a jury through this medium. The better course would have been to redact the accusations from the audio portion. We shall not reverse, however, except for an abuse of discretion and we perceive no such abuse here. We do not want to be understood as discouraging the use of videotapes which are, on balance, a reliable evidentiary resource. The limiting instructions given by the judge were sufficient to clarify the purpose for which the evidence could properly be used. See *Commonwealth* v. *Cruz,* 373 Mass. 676, 692 (1977). "[W]e assume that the jury understood and followed [these] instruction[s]." *Commonwealth* v. *Tuitt,* 393 Mass. 801, 809 (1985).

We find no merit in the defendant's argument that the videotape could have been used by the jury as evidence of the defendant's admission by silence because the defendant was not shown to be present on the videotape.

3. *Further instruction.* The defendant's case was submitted to the jury on August 28, 1984. On their second day of deliberation, the jury requested additional instruction on the meaning of proof beyond a reasonable doubt. The judge provided the instruction by repeating that portion of his original charge relating to reasonable doubt.

On August 30, 1984, at approximately 10 A.M., the jury began their third day of deliberation. At 10:05 A.M. the jury sent a note to the judge requesting further instruction on the meaning of reasonable doubt. The judge was unable to respond as soon as he received the note, because he was presiding in another session. At approximately 10:45 A.M., the jury sent a second note to the judge withdrawing the question and indicating that verdicts were reached. The defendant objected to the

judge's decision to receive the verdicts and requested that the judge inquire of the jury concerning the need for further instruction. The judge denied the defendant's request and accepted the verdicts. We find no error in the judge's decision.

The defendant correctly states that he is entitled to have issues of law explained to the jury. See *Commonwealth* v. *King,* 366 Mass. 6, 10 (1974), cert. denied sub nom. *McAlister* v. *Massachusetts,* 419 U.S. 1115 (1975). The defendant has not demonstrated that he was deprived of this right, or that any prejudice resulted from this occurrence. The jury were best suited to decide whether further instruction was necessary, and their action speaks for itself. Moreover, we find the defendant's reliance on G. L. c. 234, § 34 (1984 ed.), misplaced.

*Judgments affirmed.*