## State of Vermont v. Mary Houle

[642 A.2d 1178]

No. 92-327

Present: **Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed March 18, 1994

Motion for Reargument Denied May 5, 1994

*Jeffrey L. Amestoy,* Attorney General, and *Seth A. Steinzor,* Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Henry Hinton*, Appellate Attorney, Office of the Defender General, and *Lisa Werner*, Law Clerk (On the Brief), Montpelier, for Defendant-Appellant.

**Johnson, J.** Defendant appeals her convictions, after a jury trial, of two counts of simple assault and one count of unnecessary cruelty to a person in her care. 13 V.S.A. §§ 1023, 1305. We affirm.

Defendant was a licensed practical nurse at the Medical Center Hospital of Vermont. The criminal charges against her, which stemmed from defendant's treatment of a stroke patient, alleged that defendant slapped the victim's legs repeatedly and shackled him to his bed at the wrists and ankles with his legs crossed. By the time of trial, the victim had died of causes unrelated to the charged conduct. During the trial, the State presented the testimony of an eyewitness who was present throughout the abusive incident, the victim's wife, employees of the hospital, and an investigator for the Office of Attorney General. Defendant did not deny that she had restrained the victim, but claimed that her actions were necessary for the patient's protection and her own, and were neither assaultive nor cruel. Defendant also produced the testimony of a nurse who was familiar with the victim's medical condition and care and his need for restraint. This nurse was also used to impeach, through reputation evidence, the credibility of one of the State's witnesses.

■ Defendant's claims of error all relate to the admission of evidence. Evidentiary rulings will not be disturbed on appeal "unless it clearly and affirmatively appears that the trial court withheld or abused its discretion." *State v. Catsam*, 148 Vt. 366, 383, 534 A.2d 184, 195 (1987). Thus, a ruling will stand if it has a reasonable basis. *State v. Goodrich*, 151 Vt. 367, 375, 564 A.2d 1346, 1351 (1989).

I.

Defendant's first claim is that the trial court improperly admitted, over objection, evidence that the victim gave consistent accounts of the incidents underlying the charges to a hospital employee named Jean Herrick. At a pretrial conference, defendant objected on hearsay grounds. The court overruled the objection, but questioned the relevance of the evidence. The State argued that the evidence would prove that the victim was conscious at the time of the incident, and thus was able to suffer from defendant's cruelty. The court ruled that the evidence was admissible for the limited purpose of proving the victim's consciousness. At trial, defendant renewed her objection. On

appeal, defendant argues that the evidence was improperly admitted because it was not relevant. Although the record is ambiguous on preservation, the State does not argue that defendant's first claim of error was not preserved. We therefore treat the error as preserved and review the court's ruling for an abuse of discretion.

Defendant contends that the testimony was not relevant because: (1) the State was not required to show that the victim was "aware" of the crime to prove cruelty, and (2) even if the victim was conscious of the cruelty inflicted upon him, the fact that his statements were consistent over time, without evidence of the content of those statements, proves nothing. In fact, evidence of a victim's state of mind is admissible to prove an element of a crime. *State v. Derouchie*, 153 Vt. 29, 34, 568 A.2d 416, 418 (1989). In this case, the victim's awareness was relevant to the State's case because the trial court, in its instructions to the jury, defined cruelty as "intentional and malicious infliction of physical or emotional pain or suffering upon a person." By showing that the victim was aware of what had happened to him, the State allowed the jury to infer that he had suffered physical or emotional pain. It is true in the abstract, as defendant argues, that cruelty may also be shown by evidence of physical injury. It does not follow, however, that because other kinds of evidence may prove the crime, the State's evidence was not relevant here. See V.R.E. 401, 402.

Nevertheless, defendant argues that the State's use of this evidence in closing argument reveals its hidden agenda—to suggest to the jury that the victim's account of the events was consistent with that of the State's key eyewitness, Lena Fasser, thereby accomplishing the admission of the deceased victim's account of the events. This testimony had been offered by the State, but excluded at trial. The prosecutor's statement that the victim "would tell you just the same thing as what Lena Fasser told you" was, therefore, a reference to facts not in evidence. It was made without objection. The objection relied on by the defense for preservation of this issue was made in relation to a different statement, i.e., the number of times Ms. Herrick had spoken with the victim. Thus, defendant can prevail only upon a showing of plain error. See *State v. Roy*, 151 Vt. 17, 23, 557 A.2d 884, 888 (1989).

To meet the plain error standard, the prosecutor's statement must have been "so egregious that there is no room for doubt as to its prejudicial effect and this Court is convinced that affirmance would

result in a miscarriage of justice." *State v. Cohen,* 157 Vt. 654, 655, 599 A.2d 330, 331 (1991) (mem.). It was patently inappropriate for the prosecutor to imply to the jury what the victim's testimony would have been had he testified at the trial. But we do not conclude that the comment went "to the heart of a close case," *State v. Gates,* 141 Vt. 562, 569, 451 A.2d 1084, 1087 (1982), or could have "tipped the scales" in the State's favor. *State v. Blair,* 155 Vt. 271, 276, 583 A.2d 591, 594 (1990). The State presented a witness who was present when the incident occurred and who was able to describe the acts of abuse in detail. The credibility of this eyewitness's testimony, and not what the victim's testimony would have been, was the centerpiece of the trial. Though we disapprove of the prosecutor's statement, we do not conclude that defendant's conviction was a miscarriage of justice.

## II.

Defendant's second claim is that the State's use of her statements to a supervisor violated her right against self-incrimination under the Fifth Amendment to the United States Constitution[1] and Chapter I, Article 10 of the Vermont Constitution.[2] The State introduced evidence that defendant, when informed by her supervisor that she would be suspended pending investigation of the incident, responded by asking, "Should I get a lawyer?" and then left without making any other comment. Defendant contends that she exercised her right against self-incrimination by referring to a lawyer and that use of this reference and of her failure to respond in any other way violated her right against self-incrimination. She also argues that the wrongfully admitted evidence forced her to testify.

■ Accepting at face value that defendant's response to her suspension was intended to invoke her right to remain silent, that right did not attach in a meeting with defendant's supervisor at which no police officers were present and at which defendant was entirely free to leave.[3] *State v. McElreavy,* 157 Vt. 18, 25, 595 A.2d 1332, 1336 (1991). In *McElreavy,* we held that the right against self-incrimination, under both the United States Constitution and the Vermont

---

[1] "No person . . . shall be compelled in any Criminal Case to be a witness against himself . . . ." U.S. Const. amend. V.

[2] "[I]n all prosecutions for criminal offenses, a person . . . [cannot] be compelled to give evidence against himself . . . ." Vt. Const. ch. I, art. 10.

[3] Similarly, because the privileged right did not attach in the meeting, V.R.E. 512(a) does not apply.

Constitution, does not attach absent custodial interrogation or a situation approximating incommunicado interrogation in a police-dominated atmosphere. *Id.* The confrontation that defendant questions took place at the Medical Center Hospital with no police officers present. Defendant chose not to respond to the charges and left. Nothing about the meeting remotely suggests the kind of coercive setting necessary to invoke the right protected by the Fifth Amendment and Article 10. Defendant's reliance on *Commonwealth v. Harvey*, 491 N.E.2d 607 (Mass. 1986), in which a police officer voluntarily participated in questioning by his superiors about theft from an arrestee, does not support her argument that the employment setting here was coercive. Thus, admission of defendant's prearrest silence and her comment regarding the necessity of counsel to her private employer did not violate her right to remain silent.

## III.

Finally, defendant claims that the trial court improperly admitted evidence that defendant threatened the State's key witness, even though the State had failed to notify the defense that it intended to introduce evidence of another criminal offense as required by V.R.Cr.P. 26(c). An objection was made on relevance grounds, but not on lack of notice. Therefore, our review is limited to plain error. *Roy*, 151 Vt. at 23, 557 A.2d at 888.

■■ The State concedes that it failed to give notice, but argues that it substantially complied by disclosing the information in discovery. The State misses the point of the rule. Evidence of other crimes is particularly prejudicial if introduced at trial, and is subject to special rules of admissibility. See V.R.E. 404(b), 609. The purpose of Rule 26(c) is to inform the defendant of crimes the State intends to introduce and to allow the defendant time to respond by a motion in limine or otherwise. This burden is not met by general discovery, in which the State discloses only what evidence it has. It was error to admit the evidence when the State had failed to comply with the notice requirements, but it was not plain error. As noted above, the jury had before it substantial evidence from which it could find guilt. The evidence about the threat did not result in a miscarriage of justice.

*Affirmed.*

**Morse, J.,** concurring and dissenting. I would affirm on point III but because I disagree with the Court's reasoning there, I write separately. I respectfully dissent on points I and II.

## I.

The Court's rationale for justifying admission of the hearsay to prove the victim-patient was conscious is remarkable for what it omits. The patient's telling to head nurse Jean Herrick consistent accounts of how defendant treated him not only proved the patient was conscious, it tended to prove exactly what the prosecutor argued to the jury: "He would tell you just the same thing as what Lena Fasser told you." Lena Fasser, a nurse's aid, testified about the sadistic details of defendant's abuse of the patient. The jury would have well understood that had the patient's answers to Herrick's questions *not* implicated defendant in the crime, Herrick would not have testified for the State. In fact the testimony left no doubt about the content of the patient's communication. The questioning of Herrick began by the State asking her when and from whom she first learned of the "allegations of events involving" defendant and the patient, and then continued:

Q. And you testified earlier that you visited [the patient] regularly. When you visited him did you speak with him?

A. Yes.

Q. And could he respond to you when you spoke with him?

A. Yes.

Q. How did he manage his part of the conversation?

A. He couldn't speak words because he had a tracheotomy. He was very expressive facially and with his hands.

Q. Did you ever speak with him regarding these allegations that Lena Fasser had made to you?

A. Yes.

. . . .

Q. And were [the three] conversations [with the patient] substantially different or did each one proceed pretty much the same way?

A. Pretty much the same way.

Q. And why did you talk to him so many times?

A. I wanted to make sure that he was able to have an understanding of what was going on and be able to say the same things.

Q. What was [the patient's] demeanor like when you talked with him in these conversations?

A. Sad.

Q. Did his demeanor change as you talked?

A. Yes.

Q. And in what way did it change?

A. He would become excited, trying to get me to understand something he wanted me to understand. He would become excited.

. . . .

Q. Now, without telling me anything that [the patient] said how did you begin the conversation?

A. Letting him know that I wanted to talk to him.

Q. And what kind of things did you talk to him about?

A. Why he was sad.

Q. And did you ask him any questions specifically regarding Miss Fasser's allegations?

A. Yes.

Q. And what were those questions?

A. Did something happen to him? Did it happen at the hospital? Did it happen in the daytime? Did it happen in his room? Was the person wearing blue clothes?

. . . .

Q. Did you ask him any questions specifically directed to determining what if anything had happened to him?

A. Yes.

Q. And what were those questions?

A. . . . Were you punched, were you slapped, were you hit, were you restrained, were you tied down?

Q. Did he provide specific answers to these questions?

A. Yes.

. . . .

Q. And how did he communicate those answers? Not telling me what he said, but what was his manner? How did he get it across?

A. Hand gestures, facial gestures, mouthing words.

Q. Did he provide consistent answers from one time to the next during those three conversations you had with him?

A. On some of the information, yes.

Q. And the things that he said that were consistent from one time to the next, were they also consistent with what Lena Fasser had told you and with your personal knowledge of the hospital?

THE COURT: I just don't think that's admissible.

THE STATE: I'll move on, Judge.

The court stopped the line of questioning, but the jury had already gotten the point. Yet, the State was not content to stop and proceeded.

Q. The matters that you were discussing with [the patient] in these conversations that you had with him did they have implications for the way that the nursing staff would care for him?

A. Yes.

Q. What were the implications?

A. Were people following procedure and safety? If people were not following procedure what would be the implication? Need for education.

Q. And what would the implications for safety have to do with it?

A. For the patient. Was the patient put in a safe environment and were we providing a safe environment?

Q. Would his answering affect how you went about providing that safe environment?

A. Possibly.

Q. If he told you one thing would you respond a certain way and if he told you another thing would you respond a different way?

A. Yes.

DEFENSE COUNSEL: May we approach the bench?

THE COURT: Not yet. I can already tell you what the answer is. If there's going to be an objection it will be sustained.

DEFENSE COUNSEL: We'll object then.

At that point, the State turned to another subject.

It is hard to tell what the Court thinks of this evidence conceded by the parties and recognized by the trial court as hearsay. The Court states: "[E]vidence of a victim's state of mind is admissible to prove an element of the crime." That may be true, but the end does not justify the means. The only exception to the hearsay rule allowing

such evidence is V.R.E. 803(3). Rule 803(3), however, applies only to "then-existing" states of mind:

> A statement of the declarant's then-existing state of mind, emotion, sensation, or physical condition (such as . . . mental feeling, pain and bodily health), *but not including a statement of memory or belief to prove the fact remembered or believed* . . . .

V.R.E. 803(3) (emphasis added). Consequently, though relevant, the evidence is nevertheless inadmissible hearsay.

## II.

I profoundly disagree with the principle of governing law expressed in part II. On a related issue, I had my say as the lone dissenter in *State v. McElreavy*, 157 Vt. 18, 27, 595 A.2d 1332, 1337 (1991) (Morse, J., dissenting) (failure to attend civil deposition noticed to ask defendant about his involvement in arson was not relevant evidence of defendant's guilt in criminal case). *McElreavy*, however, does not control here.

McElreavy's "silence" in failing to attend the deposition was at best equivocal. He may not have attended because he wished to remain silent, which was his Fifth Amendment right. It is not more likely that a guilty person will remain silent in the face of an accusation than an innocent person. We knew as much at least thirty years ago, when it was said, "[T]he privilege, while sometimes a 'shelter to the guilty,' is often 'a protection to the innocent.'" *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 55 (1964) (quoting *Quinn v. United States*, 349 U.S. 155, 162 (1955)).

Here, when defendant was confronted by her supervisor, she said, "Should I get a lawyer?"—which is, I submit, the rhetorical way under the circumstances of asserting the right to remain silent. The Court agrees that is what the words mean. Had defendant not uttered a single word when confronted by her supervisor, *McElreavy* would control.

*Griffin v. California*, 380 U.S. 609, 615 (1965), held that "the Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." Hence, neither the prosecution nor the judge may suggest to the jury that defendant's silence is substantive evidence of guilt. Otherwise, defendant would suffer a penalty for exercising the right. This rationale extends to prearrest silence, which under federal law may be offered in a criminal case for the limited purpose of impeaching the credibility of the defendant. See *Jenkins v. Anderson*,

447 U.S. 231, 238–39 (1980) (Fifth Amendment self-incrimination privilege not violated when prosecution impeaches defendant with prearrest silence). No United States Supreme Court case has permitted a suspect's prearrest silence or assertion of the privilege to be used as substantive evidence of guilt. See *Coppola v. Powell*, 878 F.2d 1562, 1563, 1566, 1568 (1st Cir.) (defendant's prearrest statement in response to noncustodial interrogation, "if you think I'm going to confess to you, you're crazy," was invocation of Fifth Amendment and inadmissible evidence against defendant), *cert. denied*, 493 U.S. 969 (1989).

Contrary to the Court's view, the right against "self-incrimination" operates prospectively even if invoked in a private setting. One always has a right not to incriminate oneself even though the criminal proceeding has not yet been instituted. The right is not merely contemporaneous with the trial.

If all of this is not clear, V.R.E. 512(a) explicitly forbids comment on defendant's invocation of the privilege, no matter when invoked. It states: "The *claim of a privilege*, whether in the present proceeding or upon a *prior occasion*, is not a proper subject of comment by judge or counsel. No inference may be drawn therefrom." (Emphasis added.) Vermont could not provide a plainer rule. Under today's ruling, I fear, prosecutors may routinely introduce evidence that defendant did not come forward and speak after being implicated in a crime.

Under the Court's view, defendant was faced with a dilemma when her employer confronted her with misconduct. She could have talked about it, which would have been admissible evidence against her. She could have said nothing, which would have been admissible evidence against her. Or she could, as she did here, invoke her constitutional right to remain silent, which under today's ruling is admissible evidence of guilt against her at trial. These choices leave a suspect no Fifth Amendment protection at all. Ironically, the fact that defendant here did invoke her privilege was used to arouse prejudice against persons who "plead the fifth."

## III.

The Court analyzes, under "our plain error standard," defendant's contention that the State's failure to give V.R.Cr.P. 26(c) notice requires a new trial. In my view, no error was committed. The State was not required to give notice under V.R.Cr.P. 26(c). Not every "act," 'bad" or otherwise, committed before or after the alleged offense is

subject to Rule 26(c). Rule 26(c) refers only to V.R.E. 404(b) evidence, that is, evidence of "other crimes, wrongs, or acts" relevant to prove conformity with a particular character trait. Thus, evidence relevant, although inadmissible, to show that defendant "acted in conformity therewith on a particular occasion," V.R.E. 404(a), may be admitted under Rule 404(b), if relevant for "other purposes." In other words, evidence that is relevant to prove that a person acted in conformity with a particular character trait and therefore inadmissible may be admitted if it is relevant for another reason. Rule 26(c) simply requires notice when the State intends to take advantage of V.R.E. 404(b). V.R.E. 404(b) did not apply in this case because the evidence that defendant threatened a witness, although relevant to her character as a bad person, was not relevant for the purpose of proving that she acted in "conformity therewith" when she allegedly molested the patient.

Intimidating a witness may be obstruction of justice, but it has no bearing on how a nurse treats a patient on a particular occasion. Rather, the evidence was introduced as tending to prove defendant's consciousness of her guilt because she attempted to frighten a witness from testifying against her. This evidence was no different than evidence of "flight" or destroying evidence to escape punishment. We hardly require V.R.Cr.P. 26(c) notice for the State to introduce such evidence. On the other hand, had the State sought to prove that defendant abused other patients, notice under V.R.Cr.P. 26(c) would have been required.

For the reasons stated in points I and II, I would reverse and remand.