Tracy L. WATSON, Plaintiff,

v.

COUNTY OF RIVERSIDE,
et al., Defendant.

No. EDCV–96–0148–RT(VAPx.)

United States District Court,
C.D. California.

Sept. 5, 1997.

Michael P. Stone, Muna Busailah, Marc Berger, and Larry J. Roberts, Michael P. Stone P.C., appeared for plaintiff Tracy L. Watson.

Martin J. Mayer and Paul R. Coble, Mayer, Coble & Palmer, appeared for defendants County of Riverside, Larry D. Smith, Rick Sayre, Jeffrey H. Turley, Douglas J. Borden, and Dana C. Fredendall.

## ORDER GRANTING MOTION OF PLAINTIFF TRACY L.WATSON FOR ISSUANCE OF PRELIMINARY INJUNCTION

TIMLIN, District Judge.

## I.

## BACKGROUND

On April 1, 1996, plaintiff Tracy L. Watson ("plaintiff" or "Watson"), a deputy sheriff for the County of Riverside, participated in a vehicular pursuit which culminated in an arrest of certain individuals. He used his baton during the arrest. Upon returning to the Riverside Sheriff's Station, plaintiff was ordered to prepare a report concerning the pursuit and arrest ("report"). Watson was denied the opportunity to consult with his attorney prior to writing the report after an attorney summoned by the Riverside Sheriffs' Association arrived to assist him. Upon completion of the report, he was placed on administrative leave, and ultimately terminated from his employment with the Riverside Sheriff's Department ("Department").

In his complaint, Watson alleges that defendant County of Riverside ("County") and the individual officer defendants violated his federal constitutional rights guaranteed by the Fourth and Fourteenth Amendments by detaining him and compelling him to be isolated in a room while writing his report, by refusing to permit him to consult with the president of the employee organization, of which he is a member, and by seizing and detaining him without warrant or probable cause. Watson further claims that defendants violated his federal constitutional rights guaranteed under the Fifth and Fourteenth Amendments by refusing to allow him to consult with counsel at a critical stage of the administrative and criminal investigation. Finally, Watson alleges that County and the individual officer defendants violated his rights under the California Public Safety Officers Procedural Bill of Rights Act ("Act") (Government Code sections 3300 et seq.).

In the present motion for preliminary injunction, plaintiff Watson seeks to have this Court suppress his written report and to prohibit defendants' introduction of it in the pending arbitration appeal hearing concerning his termination from the Sheriff's Department or in any other final proceeding arising therefrom or connected therewith. Watson seeks suppression of the report on the grounds that the defendants violated his Fifth Amendment privilege against self-incrimination and his "corollary right to consult counsel in order to intelligently exercise" that privilege, and that they violated his constitutional right to due process by denying him the opportunity to consult with his attorney before or while writing it. He argues that a further basis for injunctive relief is the Department's violation of the Act. See California Government Code section 3309.5(c).[1]

## · ANALYSIS [2]

### A. Criteria for Issuance of a Preliminary Injunction

The equitable remedy of injunctive relief is first triggered by a claim of irreparable injury and inadequate legal remedies. *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982). Once a plaintiff satisfies those general equitable requirements, he must meet the burdens imposed under either the "traditional" test or the "alternative" test for obtaining a preliminary injunction. The traditional test requires the following: (1) strong likelihood of success on the merits, (2) possibility of irreparable injury to plaintiff if relief is not granted, (3) a balance of hardships favoring plaintiff, and (4) advancement of the public interest in certain kinds of cases. *Los Angeles Memorial Coliseum Commission v. Na-*

---

1. That subsection provides, in pertinent part: "In any case where the ... court finds that a public safety department has violated any of the provisions of this chapter, the court shall render appropriate injunctive or other extraordinary relief to remedy the violation...."

2. Defendants urge that plaintiff's motion is barred by the doctrine of laches. The court has considered the evidence presented by both plaintiff and defendants. It finds that plaintiff has exercised due diligence in filing this motion. Consequently, the court rejects defendants' claim of laches.

*tional Football League,* 634 F.2d 1197, 1200–1201 (9th Cir.1980).

In the Ninth Circuit, a party may also meet its burden under the alternative test, by demonstrating *either* (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. *Id.* at 1201. A "serious question" is one as to which the moving party has a "fair chance of success on the merits." *Sierra On–Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1421 (9th Cir.1984). These are not separate tests, but the outer reaches of a single continuum. *Id.;* see also *Marbled Murrelet v. Babbitt,* 83 F.3d 1068, 1073 (9th Cir., 1996). Indeed, the two tests represent "a continuum of equitable discretion whereby the greater the relative hardship to the moving party, the less probability of success must be shown." *Regents of University of California v. ABC, Inc.,* 747 F.2d 511, 515 (9th Cir.1984).

## B. *The Facts* [3]

The parties agree, to a substantial degree, as to the facts underlying this action. On April 1, 1996, plaintiff was a deputy Riverside County Sheriff involved in the high-speed pursuit of a truck driven by a suspected smuggler of illegal aliens. The truck contained a number of persons who were suspected of being illegal aliens. The pursuit ended with the apprehension of two suspects. During the arrest, Watson struck the two suspects with his baton. The arrest and use of force by Watson and another deputy sheriff were televised. According to defendant Lieutenant Fredendall ("Lt.Fredendall"), one of plaintiff's superior officers, it was not clear that the suspects had done anything to warrant being struck. Thus, Lt. Fredendall was aware at the time he viewed the videotape of the arrest, in the afternoon of April 1, 1996, that plaintiffs use of force could be "out of policy" and possibly the subject of administrative and criminal investigation. There is

some dispute as to when the administrative and criminal investigations actually began, but persuasive uncontroverted evidence establishes that defendants Lt. Fredendall, Sayre, Turley, and Borden were well aware before Watson wrote the report or while he was in the process of writing it that such a criminal investigation by the Los Angeles County Sheriff was likely, and also that an internal administrative disciplinary proceeding affecting his employment was imminent.

Subsequent to the arrest, plaintiff was directed to return to the Riverside Sheriffs Station. When Watson arrived at the station., he was met by Lt. Fredendall, who directed him to a secluded room to write his report concerning the pursuit and arrest. Such reports of official action are routinely required when an arrested suspect is not to be released from the detention facility prior to his/her initial court appearance. Watson asked Lt. Fredendall if he needed an attorney and Lt. Fredendall replied that he might need one but did not need one in order to write his report. Watson asked if he was being ordered to write the report, and Lt. Fredendall then ordered him to write it. Plaintiff wrote the report without the assistance of counsel regarding whether he should write the report and if he chose to write it, without her assistance while he was writing it.

Before Watson began writing the report, an attorney from the Riverside Sheriffs' Association came to the station to represent him. The attorney had been obtained by Deputy Harness, a director of the Sheriffs' Association, when Watson asked Harness to contact an attorney. It is undisputed that after the attorney arrived at the station, located Watson, and had begun to consult with him, she was directed by Lt. Fredendall to leave the room where Watson was writing the report and wait in another part of the station. Watson's attorney testified in her deposition that she believed that she might

---

**3.** The court is required by Rule 52(a) of the Federal Rules of Civil Procedure to set forth the findings of fact and conclusions of law which constitute the grounds for its ruling on this motion. Such findings and conclusions need not be explicit but may be implicit in the order. Addi-

tionally, such findings and conclusions are not binding adjudications, and the court may come to opposite conclusions at the trial on the merits. *University of Texas v. Camenisch* 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981).

be arrested if she attempted to return to talk to Watson. Watson testified in his deposition that his attorney advised Lt. Fredendall that she had a right to be there and she was Watson's attorney. His attorney did not so testify in her deposition. The evidence does not show that Watson or his attorney specifically asserted Watson's right to counsel or his Fifth Amendment privilege not to incriminate himself by writing the report. Watson states that the totality of the circumstances—his emotional state, his seclusion, and the manner in which Lt. Fredendall ordered the attorney to leave—rendered any such objection or request useless.

Ultimately, Watson completed the report, showed it to his attorney for review and turned it over to his superiors. He was then placed on administrative leave, and later terminated as an employee of the Department by defendant Sheriff Smith.

### C. The balance of hardships tips decidedly in favor of plaintiff

■ Plaintiff Watson argues persuasively that he will suffer irreparable injury if his report is used in the arbitral review of his termination and its contents is one of the evidentiary bases for the arbitrator's deciding against him. This is because of the finality of a binding arbitration. The court notes that defendants have not posited any harm which they would suffer by being prevented from introducing the report at the arbitration proceeding. Thus, the court finds that the balance of hardships tips decidedly in plaintiff Watson's favor.

### D. Plaintiff Watson has not raised "serious questions" with a "fair chance of success On the merits" as to his claim that his Fifth Amendment privilege against self-incrimination was violated

■ The court is mindful of the conundrum presented by the facts of this case. A police officer's duty to provide a report concerning his official actions is an essential element in the administration of our criminal justice system, and crucial to the maintenance of public confidence in it. Here, an officer seeks suppression of such a report on the basis of his Constitutional right not to incriminate himself. Thus, the public duty and the individual's rights collide. The parties find themselves in the classic clash of two fundamental principles of constitutional democracy: the ability of government to function and the individual's rights, including the right to remain silent under the Fifth Amendment. This court is called upon to navigate the intersection of these constitutional principles under the circumstances of this case.

Watson argues that his Fifth Amendment right was implicated in the circumstances surrounding the writing of his arrest report. He first relies on the general rule against relegating police officers to a "watered-down version of constitutional rights" as noted by the Supreme Court in *Garrity v. New Jersey,* 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967), and *Gardner v. Broderick,* 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968). In both of those cases, however, unlike here, police officers were being compelled to testify before either the Attorney General or the Grand Jury in connection with criminal investigations of their past actions and both faced the loss of their employment if they either invoked the Fifth Amendment or refused to waive it. The Court held that Fifth Amendment values and purposes were compromised when police officers were forced to choose between their jobs and self-incrimination. The element of compulsion, present in both *Garrity* and *Gardner,* is critical to an implication of the Fifth Amendment. Indeed, in *Gardner,* the Court indicated that if the element of compulsion were removed, an officer could constitutionally be fired for failing to answer questions relating to job performance; the means for removing the compulsion has generally been through the doctrine of immunity such that the answers would not be used in a criminal proceeding against the officer.

This court must determine whether the arrest report at issue here was "compelled" in the same sense as the officers' testimony in *Garrity* and *Gardner.* Plaintiff relies on a host of cases to buttress his assertion that his arrest report was compelled. However, those cases are readily distinguishable from

the facts before the court in this case, mainly because they each involved the official questioning of an individual regarding suspected prior misconduct as a public employee, and not a public employee's job requirement of completing a report. For example, *Spevack v. Klein,* 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967) involved an attorney's invoking of his Fifth Amendment privilege in the midst of disciplinary proceedings; *Lefkowitz v. Turley,* 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973) involved the refusal by two architects who had contracted with the State of New York, to waive the privilege when summoned to testify before a grand jury investigating criminal corruption in public contracting practices.

The court finds more persuasive arguments, on more parallel facts, in *United States v. Rios Ruiz,* 579 F.2d 670, 675 (1st Cir.1978) (use, in the officer's criminal trial, of an arrest report made by the officer did not violate the privilege because the "fifth amendment proscribes compelled self-incrimination, not incriminating statements"); in *Commonwealth v. Harvey,* 397 Mass. 351, 491 N.E.2d 607, 611 (1986) (in prosecution for larceny and civil rights violations, a police officer attempted to exclude his statements made in an administrative investigation; acknowledging that defendant, as a police officer, was required by department rules to answer questions regarding his duties as a police officer, the court nevertheless concluded that the "fact that there existed the possibility of adverse consequences from the defendant's failure to cooperate does not demonstrate that the defendant was 'compelled' to incriminate himself"); and in *State v. Falco,* 60 N.J. 570, 292 A.2d 13 (1972) (New Jersey Supreme Court limited *Garrity,* and *Gardner* to their facts, recognizing that they dealt with police officers subject to questioning for suspected prior misconduct and not with the failure to perform specific duties expected of all police officers, and refused to exclude from the officer's criminal trial a report which the officer was required to prepare).

Accordingly, the court finds that the report in issue here regarding Watson's arrest of an incarcerated prisoner was a requirement of plaintiff's job and did not constitute a compelled self-incrimination. As the element of compulsion was absent, the court finds that there is not a reasonable probability of success on the merits of Watson's contention that his Fifth Amendment right was violated by defendants when they ordered him to write the report. In weighing this factor against the balance of hardships and possibility of irreparable injury to Watson, the court will deny the motion as resting on this assertion.

**E.** *Plaintiff has raised a serious question of his being deprived by defendants of his due process right to consult counsel before and during the time he prepared his report*

■ Watson argues that even if the court finds that his report was not coerced, and thereby obtained without violating his Fifth Amendment privilege against self-incrimination, the circumstances clearly point to a violation of his Fourteenth Amendment right to due process by depriving him of counsel before and during his writing of the report, if he chose to write it. The requisites of due process necessarily vary according to the peculiarities of each situation. The touchstone of the analysis is fundamental fairness. In this case, the plaintiff was by all accounts emotionally upset and distressed. As earlier determined by this court in its ruling denying defendants' motion to dismiss the complaint, Watson had been involved in a "major incident." He requested an attorney and one arrived and began to consult with him before he began to write the report. The attorney, however, was ordered from the room by Lt. Fredendall within five minutes after she met Watson. Watson was ordered by Lt. Fredendall to prepare his report without advice of counsel. At that time, he had been told by his superior officers that the situation "did not look too good" and several deputies had suggested that he get an attorney. He had also been told by Lt. Fredendall that he was expected to document in the report any use of force. Both plaintiff and the defendant officers were aware at the time that the report was being written that there was a likelihood of both an administrative and a

criminal investigation of Watson's conduct during the arrest of the suspected illegal aliens. Fredendall also knew that the arrest report could be used against the authoring officer.

The court finds useful the reasoning in *Gabrilowitz v. Newman,* 582 F.2d 100, 105 (1st Cir.1978). In that case, a student had been denied the assistance of counsel at a student disciplinary hearing, while a criminal case against the student was pending, and the student sought injunctive relief restraining the university from conducting the hearing unless he was allowed such representation. The *Gabrilowitz* court recognized that it, too, lacked compelling precedent, and so applied the traditional due process balancing test as set out by the Supreme Court in *Mathews v. Eldridge,* 424 U.S. 319, 334–335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976):

> More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and, finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

In the instant case, as in *Gabrilowitz,* the private interest of plaintiff Watson in making "intelligent, informed choices between the risks presented" in the writing of his arrest report is substantial. Indeed, hinging on the content of his report were not only his continued employment but also possible criminal liability.[4] Thus, the consequences of plaintiff's writing of what otherwise was a routine report " 'reached well beyond the ... [station] walls in terms of potential effect upon this plaintiff.' " *Gabrilowitz, supra* at 106 (quoting the District Court's ruling).

If Watson had been allowed the continued representation of his counsel at the time she was ordered from the report writing room, which was before he began to write the report, she might have advised him that he could choose not to write the report with the possible consequence of termination of his employment for refusal to write the report. Another alternative would be to write the report with two possible consequences resulting therefrom. He could be impliedly waiving his Fifth Amendment right against self incrimination and the contents of the report could be used in a state and/or federal prosecution against him based in whole or in part on the statements in the report. In addition, the contents of such report also could be used punitively against him by his employer in an administrative employment disciplinary proceeding due to his involvement in the arrest of the suspected aliens on April 1, 1996. Further, his attorney could have advised him that before writing the report, he might seek immunity or at least transactional immunity from the state and federal criminal prosecutorial authorities precluding any criminal prosecution against him for his conduct during the subject events. Additionally, if he chose to write the report, counsel could have advised him respecting anything he wrote possibly incriminating him for potential criminal prosecution and/or being used against him in an employee disciplinary proceeding.

Without such advice of counsel, there is a substantial risk of Watson's being deprived erroneously of his interest in not being fired from his employment and not being prosecuted for criminal offenses. Defendants provided no additional or substitute procedural safeguard against such a deprivation. Defendants' allowing Watson to show his report to counsel after he completed it without her consultation and advice was no such safeguard because at that time he had already chosen without her advice to write the report, and the circumstances were sufficient to cause Watson and his counsel reasonably to believe that he could not change or redo the

---

4. The *Gabrilowitz* court noted that it is the possibility of subsequent criminal prosecution that triggers the right to counsel in order to ensure

due process. *Gabrilowitz, supra* at 104, fn. 4, citing *Mathis v. United States,* 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968).

report in such a way as to protect his Fifth Amendment right against self incrimination.

The government's interest in obtaining the report is important, but is not particularly burdened by the provision of the constitutional safeguard of counsel. As pointed out, the government has administrative remedies available to it. Thus, the court finds that this traditional due process balancing test, guided as it must be by the touchstone of fundamental fairness, raises serious questions as to whether plaintiff was deprived of his constitutional due process right to counsel before he wrote the report and while he wrote it after he chose to write it. The court concludes that plaintiff has a fair chance of success on the merits of such contention. Under the alternative test for issuance of a preliminary injunction, discussed above, a preliminary injunction, as requested, should properly issue in this case. Injunctive relief in the form of suppressing the report in the arbitral appeal hearing concerning Watson's employment termination is appropriate because the balance of harms tips sharply in his favor without such relief.[5]

## II.

### DISPOSITION

Plaintiff's motion for a preliminary injunction is GRANTED.

THEREFORE, IT IS ORDERED THAT defendants are prohibited from introducing in any manner in plaintiff's administrative appeal hearing concerning his discharge from employment with the County of Riverside, now pending before Arbitrator Alexander M. Cohn, or in any other official proceeding arising therefrom or connected therewith, the Riverside Sheriff's Department report written by plaintiff Tracy L. Watson on April 1, 1996 (report number SWR 96092026) and any and all information therefrom, and its derivative fruits.

---

**5.** Based on the court's analysis and disposition based on federal constitutional grounds, it need not and will not address the plaintiff's assertion that as to his supplemental state claim he is entitled to issuance of an injunction under California Government Code section 3309.5 because the defendants violated his rights under the Act.